Bruni et al., Appellants, v. Tatsumi et al., Appellees.

[Cite as Bruni v. Tatsumi (1976), 46 Ohio St. 2d 127.]

(No. 75-279—Decided May 5, 1976.)

128

*Mr. William B. Hewitt,* for appellants.

*Reminger & Reminger Co., L. P. A.,* and *Mr. Richard T. Reminger,* for appellees.

CORRIGAN, J. Plaintiffs urge reversal on five bases, to which we will address ourselves as enumerated.

*I.*

Plaintiffs' proposition of law No. 1 reads:

"Where an expert medical witness testifies as to a recognized medical standard in one geographical community and extends this standard to any 'moderately large metropolitan area' in which the medical specialty is practiced throughout the country, the court may take judicial notice that the community in which the defendant practices his specialty is a 'moderately large metropolitan area', where such size and type of community is common knowledge to both the court and jury, and it is error to direct a verdict for the defendant on the failure of plaintiff to prove the size and type of such community in which the defendant practiced medicine."

In August 1968, plaintiff experienced some difficulty with her right eye. It became red and painful, and she was admitted to Aultman General Hospital where Dr. Tatsumi,

a neurosurgeon, performed a series of arteriograms and a diagnosis was made of "carotid artery cavernous sinus fistula." This condition behind her right eye caused a leakage of blood. A surgical procedure was performed which involved the insertion of a selverstone clamp in her neck around plaintiff's right carotid artery. Complications later developed and plaintiff suffered a stroke. A craniotomy was later performed.

At the trial, as part of plaintiffs' case, a neurosurgeon, Dr. Wilbur George Bingham, Jr., from Columbus testified by deposition. He testified that certain surgical procedures used upon plaintiff by defendant, Dr. Tatsumi, were not accepted medical practice in Columbus. Then he was asked:

"Q. Would your opinion still hold true, Doctor, for any moderately large, or large metropolitan area in which neurosurgery is practiced throughout this country?

"A. I believe it would."

Plaintiffs contend that this answer establishes the standard of care in the medical community where this patient was treated, Canton.

Earlier in his deposition, the witness, when asked his opinion about certain things done by one defendant in connection with the treatment of plaintiff and "whether he is using accepted and good medical technique and procedure," answered, "Well, I do not have an opinion about anything that goes on in Canton. * * *"

Later in his deposition, when asked if his opinions as to standard of care and as to good medical practice would apply as well to the vicinity of Cleveland, Ohio, he replied, "I do not know how they do cases like this in Cleveland. * * *" One of the expert witnesses testifying for defendant was a Cleveland neurosurgeon, Dr. William Trowbridge.

In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar cir-

cumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations.

The issue as to whether the physician and surgeon has proceeded in the treatment of a patient with the requisite standard of care and skill must ordinarily be determined from the testimony of medical experts. 41 American Jurisprudence, Physicians & Surgeons, Section 129; 81 A. L. R. 2d 590, 601. It should be noted that there is an exception to that rule in cases where the nature of the case is such that the lack of skill or care of the physician and surgeon is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it, and in such case expert testimony is not necessary. See *Hubach* v. *Cole* (1938), 133 Ohio St. 137, and, generally, *Morgan* v. *Sheppard* (1963), 91 Ohio Law Abs. 579. In this case, the record does not disclose any circumstances and events from which an inference might reasonably arise so that a lay person might understand and judge that the physician and surgeon was negligent.

As early as 1897, Circuit Judge William H. Taft (later Chief Justice of the United States Supreme Court) wrote as follows in interpreting the Ohio law on malpractice in the case of *Ewing* v. *Goode* (C. C. S. D. Ohio, 1897), 78 F. 442, 443-444:

"Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury.

"* * *

"* * * But when a case concerns the highly specialized

art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury."

The burden of proof borne by the plaintiff in a malpractice case has been stated by the United States Supreme Court, in *Davis* v. *Virginian Ry. Co.* (1960), 361 U. S. 354, 357, as follows:

"Proof of malpractice, in effect, requires two evidentiary steps: evidence as to the recognized standard of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff. * * *"

Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things. *Ault* v. *Hall* (1928), 119 Ohio St. 422; *Amstutz* v. *King* (1921), 103 Ohio St. 674; *Bowers* v. *Santee* (1919), 99 Ohio St. 361; *Hier* v. *Sites* (1914), 91 Ohio St. 127, 130; *Gillette* v. *Tucker* (1902), 67 Ohio St. 106; *Pollack* v. *Dussourd* (C. A. 6, 1947), 158 F. 2d 969.

Failure to establish the recognized standards of the medical community has been fatal to the presentation of a prima facie case of malpractice by the plaintiffs. See annotations, 141 A. L. R. 5 and 81 A. L. R. 2d 597.

Proof of the recognized standards must necessarily be

provided through expert testimony. This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence. Courts generally have adopted one of four rules governing the standard of care with which a medical witness from one locality must be familiar in order to be competent to testify in a malpractice action against another physician or surgeon in a different locality. See annotation, Malpractice Testimony, 37 A. L. R. 3d 420.

Another important consideration in this case is that the procedure in question was in the field of neurosurgery and both the defendant and the expert witness were board-certified neurosurgeons. The broad issue facing this court is whether any locality rule of evidence in connection with expert medical testimony in a specialty is operative in Ohio. In this case, the trial court granted defendants' motion for directed verdict at the conclusion of all of the testimony.

In ruling on defendants' motion, the trial court, in part, said:

"In evaluating the conduct of a physician charged with malpractice, the test is whether, in the performance of his services, he either did some thing or things that physicians in that medical community of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things that physicians in that medical community would have done under the same or similar circumstances.

"In nearly all malpractice cases and certainly in the instant case, as is evident from the fact that plaintiffs presented only one witness, a neurosurgeon from Columbus, Ohio, the testimony of an expert was necessary to meet this burden.

"* * *

"Plaintiffs['] expert stated that he did not have an opinion of 'anything that goes on in Canton, Ohio,' and he

did not know 'how they do cases like this in Cleveland.' There was no other testimony presented by plaintiffs on this issue and the quoted statements of this witness nullified his other testimony that his methods of procedure were followed in 'metropolitan areas.'

" 'Failure to establish the recognized standards of the medical community is fatal to the presentation of a prima facie case of malpractice by the plaintiff.' (*Finley* v. *U. S. A.*, 55 O. O. 2d p. 182, Syllabus 6)."

The rationale for the locality rule was first expressed in *Small* v. *Howard* (1880), 128 Mass. 131, 136, 35 Am. Rep. 363, in the following language:

" * * * It is a matter of common knowledge that a physician in a small country village does not usually make a specialty of surgery, and, however well informed he may be in the theory of all parts of his profession, he would, generally speaking, be but seldom called upon as a surgeon to perform difficult operations. He would have but few opportunities of observation and practice in that line such as public hospitals or large cities would afford. The defendant was applied to, being the practitioner in a small village, and we think it was correct to rule that 'he was bound to possess that skill only which physicians and surgeons of ordinary ability and skill, practising in similar localities, with opportunities for no larger experience, ordinarily possess; and he was not bound to possess that high degree of art and skill possessed by eminent surgeons practicing in large cities, and making a specialty of the practice of surgery.' "

The basis for this rule was that a physician at that time in a small town lacked the opportunity to keep abreast of the advances in the medical profession and that he did not have the most modern facilities to provide care and treatment for his patients. Under these circumstances it would be unfair to hold such a doctor to the same standards of care as doctors who have such opportunities and facilities in larger cities.

Admittedly, there was ample justification for a local-

134

standard rule then and for many years following. But in this modern era means of transportation facilitate opportunities for physicians and surgeons from small communities to attend up-to-date medical seminars; the general circulation of medical journals makes new devolopments readily available to them and they can easily communicate with the most advanced medical centers in the country.

The editorial board of the Stanford Law Review, in 1962, conducted a survey to determine to what extent the practice of medicine within each of the 19 recognized specialties of the American Medical Association is similar throughout the country. Letters and questionnaires were sent to each of the American Specialty Boards, the American Medical Association, the American Hospital Association, the publishers of medical specialty journals, and medical specialty societies. The conclusion reached was as follows:

"On the basis of the existence of standardized requirements for certification, subscriptions to medical specialty journals, medical specialty societies, and statements from American Specialty Boards, it is concluded that the practice of medicine by certified specialists within most medical specialties is similar throughout the country." 14 Stanford L. Rev. 884, 887 (1961-62).

So, the locality rule has been increasingly eroded as being antiquated and unrealistic, especially in the medical specialties field.

What the trial court had before it in this case was truly the competency of a board-certified neurosureon, an acknowledged specialist from Columbus, testifying about the practice of another neurosurgeon, the defendant, in Canton. The latter is "* * * obligated to bring to the discharge of his duty that degree of skill and knowledge possessed by physicians who are specialists in the light of present day knowledge. * * *" (*Wood* v. *Vroman* [1921], 215 Mich. 449, 465, 184 N. W. 520.) Accordingly, the standard of care in this case is that owed to a patient by the community of neurosurgeons. Geographical conditions or circumstances

.

do not control either the standard of the specialist's care or the competence of the expert's testimony.

Here, the credentials of the expert, Dr. Wilbur George Bingham, Jr., are flawless. His testimony, in part, at the trial was that some of the procedures used by Dr. Tetsuo Tatsumi in treating the plaintiff were not accepted medical procedures. A jury question was presented thereby and the jury should have been permitted to pass on it under a proper charge of the court. For the reasons stated, it was error to direct a verdict for defendant.

## II.

Plaintiffs' second proposition of law is as follows:

"Where medical evidence discloses that there was more than one surgical method and procedure recognized in the medical community to accomplish the same surgical result, but that one surgical procedure was known in the specialized medical community to carry a higher risk of injury to this plaintiff than the other procedure, and that good medical practice dictated using the procedure having the least risk of injury to plaintiff; and where there is evidence showing that the procedure having the higher risk was used, and that plaintiff sustained injury, such a fact situation raises a question of fact for a jury as to whether the course of action taken by the defendant physician was, under the evidence, discretionary; and it is error for a trial court to direct a verdict for defendant on this issue."

The record reflects that there is testimony by Dr. Wilbur George Bingham, Jr., that there is a higher degree of risk in performing a neck ligation prior to a craniotomy under the circumstances in this case, and a jury question was thereby presented under a proper charge and it was error to take the question away from the jury.

## III.

Plaintiffs' third proposition of law states:

"It is error for a trial court to direct a verdict for the defendant where in a malpractice case, the defendant's expert witness testifies that a certain medical procedure, if performed, would not constitute 'good medical practice',

and where additional expert and lay witnesses' testimony establishes that such a 'medical procedure' was in fact performed upon plaintiff, such testimony establishing 'recognized standards of the medical community' and presenting a prima facie case of malpractice to be considered by a jury.''

For the reasons set out under Part *I, supra,* this proposition of law is well taken.

### IV.

As a fourth proposition of law, plaintiffs suggest:

"It is error for a trial court to direct a verdict for the defendant on the issue of informed consent, where, in a malpractice case, the plaintiff makes a judicial admission that she was advised of the surgical procedure that would be performed upon her and the risks incident thereto, where the evidence shows that the surgical procedure used was not the same as the surgical procedure explained to plaintiff and offered a significantly higher risk of injury to plaintiff.''

In the instant case it is difficult to determine exactly what injury appellant complains of as resulting from a lack of informed consent.

Although not particularly well developed in Ohio cases, other jurisdictions have held (1) that an unrevealed risk which should have been made known must materialize; (2) that the unrevealed risk must be harmful to the patient; and (3) that causality exists only when the disclosure of significant risks incidental to treatment would have resulted in the patient's decision against that treatment.*

---

*E. g., *Canterbury* v. *Spence* (1972), 150 U. S. App. D. C. 263, 281, 464 F. 2d 772, 790, and fn. 103. See, generally, Notes, Informed Consent—A Proposed Standard for Medical Disclosure, 48 N. Y. U. L. Rev. 548, 549, and cases cited (1973). One commentary has observed that these elements were suggested by the Missouri Supreme Court in *Aiken* v. *Clary* (Mo., 1965), 396 S. W. 2d 668, 676, the case that was the principal authority for the leading Texas decision, *Wilson* v. *Scott* (Tex.), 412 S. W. 2d 299, 301-304. Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw. U. L. Rev. 628, 647, fn. 74 (1970).

The evidence seems conclusive that plaintiff Dorothy Bruni, either personally or through her husband and parents, was fully informed of the facts concerning each operational procedure to be performed and that she gave her written consent without question or equivocation. However, under this record, the question of whether she consented to the procedure that was actually performed on her is an issue for the jury to decide.

Accordingly, for that reason we sustain this proposition of law.

## V.

Proposition of law No. 5 claims:

"It is error for a trial court to direct a verdict for the defendant on the issue of medical abandonment, where expert medical testimony disclosed that the surgery performed on the plaintiff by the defendant was unsuccessful, that further surgery was recommended, and that failure to perform further surgery in a timely manner aggravated and prolonged the plaintiff's illness."

Again there is absolutely nothing in the record to support such a claim of abandonment. Upon completion of their treatment, defendants sent plaintiff back to her original physician, Doctor Winestock, who had referred the case to them.

Plaintiff, herself, chose to seek the services of another surgeon. This proposition is overruled.

The judgment of the Court of Appeals is, therefore, reversed and the cause remanded for further proceedings.

*Judgment reversed.*

O'NEILL, C. J., HERBERT, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.