**Charles SMITH, Plaintiff,**

v.

**UNITED STATES of America, DEPARTMENT OF VETERANS AFFAIRS, Defendant.**

No. 1:92CV0507.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 31, 1994.

Howard D. Mishkind and Fred Weisman, Weisman, Goldberg, Weisman & Kaufman, Cleveland, OH, for plaintiff.

William J. Kopp and Terry J. Wolk, Office Of The U.S. Atty., Cleveland, OH, for defendant.

## MEMORANDUM AND ORDER

ALDRICH, District Judge.

Charles Smith, a physically healthy black man, entered the Veterans' Administration (VA) Hospital at Wade Park on March 17, 1990, for treatment of an acute episode of his ongoing schizo-affective disorder. On April 7, 1990, after a gradual build-up of seemingly unrelated symptoms, an operation was performed to relieve pressure on Smith's spinal cord resulting from a previously undiagnosed spinal epidural abscess. The operation was too late. Smith was a quadriparetic, or functional quadriplegic. At some point between March 17 and April 7, Smith's functional quadriplegia became irreversible. Because that occurred after the doctors at the VA Hospital knew or should have known that Smith had a developing medical problem which could have been successfully treated, the United States of America is liable to Smith for his injuries, and hereby is directed to pay Smith $5,199,401.73.

### I.

### FINDINGS OF FACT

Charles Smith served in the Air Force from 1965 to 1968. Plaintiff's Exhibit 36. He was first diagnosed as having schizophrenia in 1972, but this illness is not considered to be service-related, such that he would be entitled to admission to the Veterans Administration hospital facilities. Defendant's Exhibit A, 1972 Admission Records.[1] Rather, Smith is an "eligible" veteran, one whose

---

1. The government has submitted Smith's hospital records from all of his past admissions at the VA hospital as "Exhibit A." Where page numbers are noted, the Court is referring to the records of the March 17, 1990, admission, which are collated and paginated in a binder separate from the remainder of Exhibit A. References to other portions of Exhibit A will be made as clearly as possible.

military service enables him to obtain care at a Veterans Administration hospital for his non-service-related illnesses whenever sufficient beds are available.

Smith has been admitted to the VA Hospital psychiatric ward 15 times since 1972; his admissions grew progressively longer and occurred more frequently as time passed. *See generally,* Defendant's Exhibit A. Smith generally required hospitalization when he stopped taking his medication or started drinking alcohol while taking his medication. *Id.* In either event, Smith began hearing voices, which directed him to do certain things such as run around naked or start fights. Transcript (T.) 591.

On the occasion of his March 17, 1990, admission, Smith had been drinking in a bar, had gotten into a fight, and was taken by police to Huron Road Hospital, then to St. Vincent Charity Hospital, and ultimately to the VA hospital. Defendant's Exhibit A at 4–19. By the time he arrived at the VA, Smith was in four-point leather restraints and had been medically cleared at Huron Road Hospital, after being treated for a small (one-half centimeter) laceration above his right eyebrow. *Id.* Smith was sent to Ward 31—the psychiatric ward—and was assigned Dr. Magdi Rizk as his attending physician. Dr. Rizk was not present in the hospital at that time, and did not actually see Smith until March 19. T. 112–13.

Smith developed an acute problem with his respiration and level of consciousness on March 19, shortly after his arrival; his breathing was loud and labored, and he was fading in and out of consciousness. Defendant's Exhibit A at 27. Smith was sent to the acute treatment room, and it was determined that Smith's psychiatric medications were responsible for his condition. T. 137. Some medications were discontinued, others were reduced, and a marked improvement in his condition was observed. Defendant's Exhibit A at 29–30.

By March 23, Smith's episode of respiratory distress was behind him. His psychosis apparently was improving as well, but he began to complain of pain in his shoulders. *Id.* at 48. Smith continued to complain of his shoulders and his neck hurting, but he him-

self attributed his pain to his service for over 20 years as a letter carrier, and to some osteoarthritis. *Id.* at 51. In addition, it was noted in Smith's hospital record that neck stiffness and shoulder pain had been common complaints in the past, and could be attributed to his work as a letter carrier and to the side effects of some of his anti-psychotic medication. *Id.*

During the next week, Smith's psychosis was generally improved, although he continued to have trouble with his shoulders and neck. Almost every progress note in the record during this time makes some mention of his complaints of shoulder and neck pain, or of observations of him holding his shoulders and neck. *Id.* at 48–56. A rheumatology consultation was requested on March 27, and the consult occurred on March 29. *See id.* at 114–15. The rheumatology resident conducted a full physical and neurological examination of Smith, noting that Smith reported bilateral shoulder pain increasing with activity as "an ongoing problem since '79." *Id.* at 114. Various tests were ordered; among them was an erythrocyte sedimentation rate (ESR). It was generally accepted that Smith's pain was the result of osteoarthritis and the side effects of his psychiatric medication.

On April 1, Smith became actively psychotic. *Id.* at 57. He was hallucinating and crying out to someone named Michael, and the staff placed Smith in four point leather restraints. *Id.* As a result of Smith's being in restraints, special attention was given to the condition of his extremities, and his restraints were rotated frequently while he was awake. *Id.* at 57–58. As of April 2, Smith was able to move his extremities, and in fact threw a urinal when the staff would not cooperate with his desires. *Id.* at 58–59. That evening, he asked for ice water and when he received it, poured it over himself. *Id.* at 60. On April 3, Smith was incontinent of urine—not unusual in Smith's past hospitalizations when he was in restraints—and complaining of shoulder pain. *Id.* By that afternoon, Smith was out of restraints, walked to the shower and bathed himself, but upon returning to his room stated that he could not get into bed. *Id.* at 62–63. He

was given a pillow and he lay down on the floor. *Id.* at 63.

By the early morning hours of April 4, Smith was lying on the floor, incontinent of urine, complaining of numbness, and giving "the impression of being completely helpless." *Id.* at 64. He was helped into bed, but his failure to move was interpreted as a manifestation of his psychological condition—again, not an unusual situation for Smith, who generally became more dependent as his psychosis waned. T. 1311–12. Late in the day, the staff attempted to help Smith to sit up; he lunged toward one of the nurses and brushed against her breast. This conduct appeared to the nurse to be intentional. T. 1308. Attempted sexual contact with the nurses and staff was one of Smith's constantly recurring behaviors when he was hospitalized. That night, it was noted that Smith could not lift himself, and would not use his hands. Defendant's Exhibit A at 67.

On April 5, a medical student noticed that Smith was having difficulty breathing, and sought a pulmonary consult. *Id.* at 66. By 11:00 a.m., Smith stated that he was unable to lift his arms to feed himself. *Id.* at 69. Smith's contradictory claims were noted by one of the nurses, who observed that although he purported to be unable to use his hands, Smith was hitting the bedside rail with his left forearm. *Id.* at 70. As of 8:30 p.m., he continued to claim he could not move, but was moving his left forearm "in a flaccid manner." *Id.* at 73. Smith was noted to be unable or unwilling to grip the nurse's hand, and he complained that his legs would not hold him up. *Id.*

As of 6:00 a.m. on April 6, Smith was complaining that his back and neck hurt, he couldn't move, and his legs and feet had no feeling. *Id.* at 74. During range of motion exercises, he said that the passive movement of his arms felt good. *Id.* Later that day, a medical student noted that the result of the ESR taken on March 30 was 111[2]—more than twice the normal rate—and also noted the stiffness in Smith's shoulders. *Id.* at 75–76. The same medical student noted a white blood count (WBC) of 18.1—also well above the normal limit—from Smith's April 5 lab

results. *Id.* at 76. An unidentified staff member noted on the chart that as of April 6, Smith had been unable to move his extremities for about five days, and had shoulder pain. *Id.* at 77. The psychiatry resident noted that Smith had been unable to move and had been incontinent of bowel and bladder for three days, and noted as well that Smith had a fever of 101.1 degrees. *Id.* at 80.

By the end of the day on April 6, and into the early morning hours of April 7, the staff at the VA hospital knew that something was seriously wrong with Smith. Early in the morning of April 7, after evaluation by neurologist Robert Ruff, Smith was taken to University Hospital for magnetic resonance imaging (MRI) of his neck, which revealed a mass subsequently identified as a spinal epidural abscess. *See id.* at 85–86. By the time it was excised, it had been pressing on Smith's spinal cord too long for any spinal cord function below the level of cervical vertebrae four and five to remain. Because Smith does not challenge the care he received during and after his surgery, that care will not be addressed in any great detail here.

**Standard of Care**

Before addressing the standard of reasonable care applicable to the ward where Smith was hospitalized at the relevant time, the Court must make an observation shared by everyone associated with this lawsuit: the standard of *nursing* care on Ward 31 was exemplary. It is not a subject of any debate that the nurses and nurses' aides on the ward performed their duties in a fine and dedicated manner. But for their conscientious observation and detailed notes in Smith's chart, it is unlikely that any determination of precisely what happened at various critical times could be made. Whatever errors may have been made by the medical staff, the nursing staff took very good care of Smith.

Much evidence was introduced about the standard of care on Ward 31, the psychiatric ward where Smith was hospitalized when his medical problems developed. Experts testifying for Smith stated that patients on Ward

---

**2.** The ESR actually was 110; the score of 111 in the chart was merely a stenographic error.

31 were or should have been treated to the same standard of care as patients on a medical ward; experts testifying for the government explained that Ward 31 was run "differently," and common medical procedures such as taking temperatures and blood pressures were not done on a frequent basis.

Although Ward 31 is run differently than other wards at the VA hospital, the standard of care should be and is the same as in those other wards. That is, each patient on Ward 31 is entitled to the same dedication and effort on the part of each staff member as any other patient in the hospital. What specific actions that dedication and effort indicate in Ward 31, however, is something quite different from the activities in regular medical wards.

On Ward 31, the major emphasis is on observation of the patients' behavior, as that is a primary indicator of incipient psychiatric problems. T. 1049. Medical procedures such as taking temperatures and blood pressure readings are less commonly done, because generally they are unrevealing of the progress of psychiatric disorders. T. 1046–47. On a medical ward, on the other hand, temperatures and blood pressures are taken regularly, as probable indicators of precisely the sort of problems that would be expected on that ward. Deposition of Dr. Jeffrey A. Lieberman (Lieberman Deposition) at 23. Any failure to take Smith's temperature during part of his stay on Ward 31 therefore did not constitute a failure to meet the standard of reasonable care for that ward.

This is so even though Smith made much of the absence of recorded temperatures in his chart between March 23 and April 1. Smith's apparent theory is that his temperatures, if recorded during that time, would inevitably have led the doctors to take some action to prevent his ultimate injury. Smith is assuming, however, that his temperature would have been above normal during that time, and that cannot be known.

In addition, it is not clear whether Smith's temperature was *not* taken, or instead, *was* taken but was not recorded on his chart. The nursing supervisor testified that temperatures were taken once per shift, recorded on a common chart at the nursing station, and then transcribed into the patient's individual chart. T. 1264–65. It appears that the transcription of temperatures did not occur regularly during the relevant time, and for that reason Smith's temperatures do not appear on his permanent chart. T. 1265.

Irrespective of whether Smith's temperature actually was taken during that time, his temperature does not appear in his chart. Such a failure, in and of itself, does not constitute a departure from the standard of reasonable care on a psychiatric ward. Even if the failure to note Smith's temperature in his chart were considered to be a departure from the standard of reasonable care, that alone would not suffice to show negligence such that the VA's liability thereby would be proved.

### Erythrocyte Sedimentation Rate

Of primary importance was Smith's ESR of 110, taken on March 30, the result of which was available to the Ward 31 staff on April 2, but which was not seen—or at least was not noted in the record—until April 6. Defendant's Exhibit A at 128, 75. Although expert witnesses for both sides purported to disagree, in fact there was very little disagreement among the experts about the nature and importance of this test.

First, the experts agreed that the ESR is not a diagnostic test; some called it a confirmatory test, or a test used to aid in confirming a diagnosis. T. 997. Irrespective of the level of a patient's ESR, there is no way of knowing from that test alone what is wrong with the patient. T. 995.

The experts concurred that, generally speaking, one of three problems usually accounts for an elevated ESR: infection, cancer or a connective tissue disorder. Videotaped Deposition of Dr. Donald Austin (Austin Deposition). Although the experts disagreed about which of these three disorders is more prevalent, they agreed that these three are the primary culprits causing a high ESR. It is clear in hindsight that Smith's elevated ESR was related to an infection—the abscess growing in his neck.

The experts further agreed that an ESR of 110 was very high—a normal ESR for a

patient of Smith's age, race and physical condition would have been 50 or lower. Further, most of the experts agreed that an ESR of 110 would be an indication that, at the least, a repeat ESR should be done to verify the validity of the abnormal result. Lieberman Deposition at 64, Austin Deposition, T. 1191. Dr. Liang in fact would have performed a physical examination rather than doing a second ESR. T. 1002. While the experts disagreed about the speed with which a repeat ESR should be done, T. 999, they all essentially conceded that with an inpatient like Smith, the repeat test could have been done immediately. The error—and hence the negligence—occurred when the test result showing Smith's ESR of 110 was not reviewed by his doctors or even noted on his chart until April 6, a week after it was performed.

The VA's care of Smith was negligent and fell below the standard of reasonable care when nobody read the lab results from the tests performed on Smith on March 30. It appears from the record that those results became available on Ward 31 on April 2. *See* Defendant's Exhibit A at 128. Yet no doctor—neither the doctor who ordered the tests, Smith's attending physician, the resident assigned to him, nor the medical student assigned to care for him—read the results until April 6. On that date, the medical student noted the ESR of 110 in Smith's chart and plainly, if ungrammatically, observed that the result "is concerning, and needs getting looked into." VA Exhibit 1 at 75.

It is unquestionable that whatever the practice on Ward 31 regarding temperatures and blood pressures, the results of tests specifically ordered for a given patient, as a result of specific complaints made by that patient, should have been reviewed as soon as they were available. The fact of ordering those tests made the immediate review of their results mandatory.

It cannot be known how an awareness of Smith's extremely high ESR would have influenced the staff's review of the progress notes between April 2 and April 7. The high ESR read in conjunction with the note on April 3 that Smith could not get into bed, for example, might have alerted the staff to his underlying problem, and led to a quicker diagnosis of it. *See* Defendant's Exhibit A at 62–63.

While it cannot be known with certainty just what would have occurred had the ESR result been observed by one of Smith's doctors on April 2, one thing is certain: on April 2, Smith had at least a chance to fully recover from his infection. By April 6, when the ESR result finally was noted in his chart, that chance was gone.

### Attending Physician

At trial, Smith emphasized the lack of notes in his chart from his attending physician, Dr. Rizk. It is true that Dr. Rizk wrote no notes in his own handwriting, although he did co-sign a number of notes from medical students and residents. In light of the absence of notes from Dr. Rizk in Smith's chart, it is impossible to know whether he was aware of Smith's symptoms, and if he was, whether he could have done anything to save Smith from his ultimate fate. It appears, from the absence of Dr. Rizk's input in Smith's chart, that Dr. Rizk's care of Smith was negligent.

No witness questioned the proposition that the attending physician is the person ultimately responsible for the patient's care. One witness characterized the attending physician as the "captain of the ship." Austin Deposition. As such, in addition to his own failure to note Smith's hospital progress, Dr. Rizk also is responsible for the failure of any responsible person to view and appreciate the significance of Smith's extremely elevated ESR before April 6. These failures represent a shameful lack of interest in an extremely sick man.

### Last Chance

The experts disagreed about when Smith last could have been treated for his abscess without residual ill effect; these disagreements are immaterial, however, because they all agreed that April 6, the date on which the elevated ESR value appeared in Smith's chart, was *after* Smith's last chance to avoid his paralysis.

Dr. Conomy stated that had Smith's abscess been caught by April 6, he would not

be paralyzed today (T. 392–93); Dr. Austin testified that Smith reached a point of no return in terms of his quadriplegia late on April 5 or early on April 6 (Austin Deposition); Dr. Ruff testified that by April 4, Smith was in essentially the same condition he is now (T. 1205); and Dr. Fenstermaker opined that Smith became quadriplegic on or shortly after April 4 (T. 1246). None of the expert witnesses or treating physicians stated that if Smith's condition had been diagnosed on April 2, the date on which the ESR result was available, he could not have been saved.

## II.

### CONCLUSIONS OF LAW

■ The seminal case on the standard of care and negligence in medical malpractice cases in Ohio is *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 346 N.E.2d 673 (Ohio 1976).

> In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations.

*Id.* at 129–30, 346 N.E.2d at 676. The court defined the plaintiff's burden as follows:

> Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or

things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things.

> Failure to establish the recognized standards of the medical community has been fatal to the presentation of a prima facie case of malpractice by the plaintiffs.

*Id.* at 131, 346 N.E.2d at 677 (citations omitted). *See also Rogoff v. King,* 91 Ohio App.3d 438, 444–45, 632 N.E.2d 977, 981 (Ohio App.1993) (compliance with the standard of care and issues of proximate causation generally established through expert testimony).

Every witness on the issue agreed, albeit reluctantly in some cases, that under the applicable standard of care, Smith's ESR results should have been reviewed before April 6. Most witnesses agreed that by two or three days after the test was done on March 30, someone should have been looking for the test results, and the response to the abnormal ESR would likely have led to an earlier discovery of Smith's abscess. The witnesses varied widely in what they thought was the proper response to an ESR of 110— most would take a repeat ESR, some would order a WBC, others would conduct a thorough physical exam of the patient—but all agreed that they would have done *something.*

"If no treatment, in a particular situation, meets the standard of care, then a plaintiff can have no recovery. Where no treatment violates the standard of care, showing what should have been done in lieu of no treatment is implicit in the identification of the relevant standard of care." *Wells v. Miami Valley Hospital,* 90 Ohio App.3d 840, 849, 631 N.E.2d 642, 647 (Ohio App.1993), *jurisdictional motion overruled by* 68 Ohio St.3d 1464, 627 N.E.2d 1004 (Ohio 1994).

The failure to review the results of Smith's ESR constituted negligence under the relevant standard of care; that failure led to the failure to make an early diagnosis of Smith's spinal epidural abscess,[3] and was itself the proximate cause of his eventual paralysis.

---

**3.** Although the government urged that spinal epi-    dural abscess is extremely difficult to diagnose,

Negligent conduct is the "proximate cause" of an injury if the injury is the natural and probable consequence of the conduct. An injury is the natural and probable consequence of negligent conduct if the injury might and should have been foreseen. An injury is foreseeable if a reasonably prudent person, under the same or similar circumstances, would have anticipated that injury to another was the likely result of his conduct.

*Reed v. Weber,* 83 Ohio App.3d 437, 441, 615 N.E.2d 253, 255 (Ohio App.1992) (citations omitted), *jurisdictional motion overruled by* 66 Ohio St.3d 1440, 608 N.E.2d 1085 (Ohio 1993). In light of the fact that each of the three primary causes of a high ESR result—connective tissue disorders, infection and cancer—can manifest itself in a very serious illness, it was foreseeable that ignoring a high ESR would lead to serious injury.

Smith has succeeded in demonstrating the applicable standard of care, in showing a negligent failure of the VA to conform to that standard of care, and in establishing that the negligence proximately caused his injury.

This Court therefore finds in favor of the plaintiff on the issue of liability.

## III.

## DAMAGES

### A. Life Expectancy

Smith seeks damages on two different bases: future medical costs and physical care, and reimbursement for the loss of enjoyment of life. In order to determine the appropriate amount of damages, one issue must be addressed first: Smith's life expectancy.

■ Smith urges that his life expectancy should be calculated in the same way as for a physically and psychiatrically normal black male of his age, and argues that no reduction in life expectancy for either his schizophrenia or his spinal cord injury should be taken into consideration in determining the proper measure of damages for his medical costs. The government contends, to the contrary, that

because of Smith's spinal cord injury, his life expectancy in reality is reduced, and the VA's burden of financing his care likewise should be reduced to include only the length of time a spinal cord patient is likely to live.

Before he became quadriplegic, Smith was schizophrenic. The VA is in no way responsible for that schizophrenia. Schizophrenics, as a group, have a reduced life expectancy when compared to society as a whole. Dr. Lieberman estimated that a person with Smith's psychiatric disorder would have a life expectancy reduced by about ten years from the normal span. T. 1561. Dr. Burke testified that the average life expectancy for a person of Smith's age, gender and race is 73 years, or about 22.6 years from the time of trial. T. 836. If that life expectancy is reduced by ten years to account for Smith's schizophrenia, then Smith's life expectancy at the time of trial was 12.6 years.

■ The government put on evidence to show that Smith, as a spinal cord patient, had a life expectancy reduced by that disability to 10.7 years. T. 1505. Smith's counsel argues strenuously that the reduction in quadriplegics' life expectancy is related to the quality of care they receive, and contends that if Smith receives the best possible care, he will live out the average life expectancy of a non-quadriplegic of his age, race and gender. Although this Court finds Smith's argument unpersuasive, the government's life expectancy figure for Smith as a quadriplegic will not be used, either. It is a maxim as old as the law that a wrongdoer must not benefit from his misdeeds. If this Court reduced Smith's damages as a result of his reduced life expectancy as a quadriplegic, then the government would benefit from its negligence in having made Smith a quadriplegic in the first place. While the resulting damages award may modestly overpay Smith in light of his actual life expectancy, it is more appropriate to overpay Smith than to allow the government to realize a windfall because of its negligence.

By the same token, however, it would be nonsensical to deny that Smith's life expec-

that difficulty does not absolve the VA physicians from their responsibility to *try* to diagnose Smith's ailment. It is insufficient to argue that

had the VA reacted to Smith's high ESR sooner, the doctors might have misdiagnosed his problem.

tancy is reduced by his schizophrenia. The government had nothing to do with inflicting Smith's mental disorder, and it is probable that the reduced life expectancy of schizophrenics generally applies to Smith. Consequently, after accepting Dr. Burke's 22.6 year life expectancy for an average man of Smith's age and race, and after accepting Dr. Lieberman's ten year reduction for Smith's schizophrenia, damages for Smith's future medical care will be calculated on the basis of a 12.6 year life expectancy.

## B. Life Care Damages

■ Although Smith contends in his post-trial brief that it is improper for this Court to make a determination of where Smith should live and what kind of care he should receive, this Court disagrees. In arriving at an appropriate damages figure, this Court must consider the cost of Smith's lifetime of care, and in so doing must look at the most realistic estimate of that cost. Because the Court is convinced that home care is not a realistic option for Smith, and is further convinced that the extra expense allotted therefor is not justifiable, the Court will award Smith's damages on the basis of the cost of skilled nursing facility care.

Smith's counsel and the witnesses called on Smith's behalf all urged the Court that Smith wanted to live independently in his own home, with caregivers there taking care of his physical and mental needs. They did not, however, convince this Court that adequate support structures exist to allow Smith to successfully accomplish this goal.

Smith's schizo-affective disorder makes him essentially unable to manage either his own care, or his caregivers. Because Smith cannot manage his caregivers, the Court must determine whether there are others who could manage Smith's home care.

It was universally agreed by the expert witnesses that one of the most important support structures for a spinal-cord injured patient seeking to live at home is a supportive, involved family. T. 827, 1426, 1475. There is absolutely no evidence that Smith's family is prepared to undertake the effort needed to make the home-living option viable.

Smith's sisters noted their willingness to help manage his care if he were to live at home. T. 515, 564. Neither of them evinced any intention of actually living with Smith, however, or of taking responsibility for any part of his daily care.

One of the best indicators of future action is past behavior. Consequently, it was encouraging to hear Smith's sister Laureen Smith testify that she visits him two to three times a week at the spinal cord unit at the VA. T. 563. However, the VA staff members testified otherwise.

Smith's caregivers on the spinal cord unit testified that they had seen Smith's father a number of times, and that Smith and his father had gone out of the hospital on day trips together several times. T. 1396, 1446. They further observed, however, that no member of Smith's family had ever attempted to obtain permission to take Smith out of the hospital overnight. T. 1396–97. Smith's treating physician, Dr. Barbara Gothie, would not recognize his sisters if she saw them. T. 1396. When she was asked what, if money were no object, would improve Smith's quality of life, Dr. Gothie gave the following poignant answer:

> I would wish the family would be more visible, to get to know them, I mean to incorporate them. I think they have deprived themselves of dealing with Charles Smith in the last two and a half years. They have not been around. That to me displays a lack of interest that is unfortunate, and I think we are doing a much better job and he relates better to us as his adoptive family, so to speak, than his own family who—I remember one birthday where he told me it was his birthday, but there was nobody there, no card.

T. 1414–15.

Even in Smith's previous admissions on Ward 31, his family was notably absent. One of the nurses who had been there from his first admission in 1972 onward recalled weekly visits from Smith's father, but had never even seen Smith's sisters. T. 1269.

Smith's 69 year old father, by all reports, has faithfully visited his son throughout all his admissions, and has been the only person

to take Smith out of the hospital for visits since Smith became quadriplegic. Smith's father cannot take on the management of his quadriplegic son's care by himself, however. His advanced age and history of problems with alcohol make him a poor candidate for the job.

This Court cannot find that Smith's sisters, who have never been involved in Smith's care, and who have never visited him on a regular basis, will suddenly as a result of the outcome of this lawsuit become involved, attentive caregivers. That being the case, and with all the experts agreeing that an involved family is of paramount importance to the success of a spinal cord patient in a home setting, this Court cannot find that a home care setting is a viable option for Smith.

An important factor in reaching this determination was the testimony and demeanor of Smith himself. Although Smith testified under questioning from his counsel that he wanted to live independently in a home, he clearly had no appreciation of the responsibilities and risks involved. On cross examination, Smith stated that if he "started having problems" at home, he wanted to return to the VA for treatment. Smith stated positively, "I receive excellent treatment." T. 609. When asked about the nurses and staff who had cared for him on the psychiatric ward, as well as on the spinal cord unit where he currently resides, Smith's demeanor showed genuine affection for the VA staff.

The Court reviewed the "Day in the Life" video, showing Smith's day-to-day existence at the VA, and found that Smith in general seemed very happy and comfortable in his surroundings, and that the caregivers seemed to care about Smith's happiness, as well as his health. Smith participates in a wide variety of activities at the VA, as shown by the video, and seems to enjoy and benefit from each of them. Those activities would be less easily available to Smith if he lived at home.

This Court therefore determines that home care is not an appropriate option for Smith.

Unlike home care, care in a skilled nursing facility will provide Smith with the best from both worlds: he will be in a more home-like, long-term facility than the VA hospital, but he will have the benefit of a multidisciplinary approach unavailable in a home setting. As noted by Smith's physician, Smith requires the stability provided by a large staff—he finds change extremely stressful, and while staff members do leave nursing facilities, the departure of one caregiver in the context of a larger staff would be less disruptive to Smith than that same individual's departure from a staff of only one or two caregivers in his home. *See* T. 1395.

Dr. Gothie raised another important reason for placing Smith in a skilled nursing facility: Smith's interactions with other patients.

I think this is one of the most underappreciated factors, how much patients learn from their peers, and just being around other patients is helpful for a number of different reasons. First of all, you compare notes. You always feel you are a little better off than your neighbor because you can do this and he cannot do that. That goes for everybody.

As individuals, and as a group, they help to shape what's going on on the floor. I think this is very useful, and I mean we encourage this, so that they get together socially, and also they compare notes about their therapies and how to approach a doctor and caregiver and whatnot. And I think this is very useful because a peer experience cannot be replaced by anything else.

T. 1402. Smith needs not only a number of caregivers, but also the company of several other persons with problems similar to his, so that he can feel less alone, and more a part of a community.

Smith also is subject to sudden infections which, in a home setting, are unlikely to be caught in time to prevent serious injury. T. 1410–11. In light of Smith's physical, mental and social needs, it is apparent to the Court that skilled nursing facility care will best serve Smith.

Both Smith and the government provided the Court with plans estimating the costs of Smith's care in a skilled nursing facility; each included different items and reached a

different conclusion as to cost. Of the two plans, the Court finds that the plan submitted by the government most realistically mirrors the actual costs and expenses likely to confront Smith throughout the remainder of his life.

The plaintiff's plan suffers from a number of flaws. Most troubling is the fact that Smith's life care planner listed items in his nursing home plan that would be required and should be included only in a plan for home care, and not in a skilled nursing facility care plan. Those items, however, are included in Smith's economist's cost chart for skilled nursing facility care.[4] Additionally, the products and care listed on the care plan submitted by Smith's life care planner were the result of a 1991 evaluation of Smith's needs; although Cyphers submitted an "updated" plan on December 20, 1993, this also included items no longer appropriate to Smith's current needs, including a special kind of bed which he does not currently use and elective surgical procedures which Smith has stated he has no intention of undergoing.

The Court finds that the plaintiff's plan simply is inadequate, and does not aid the Court in arriving at an amount appropriate to compensate Smith for his future medical care.

The government's plan, on the other hand, provides the Court with guidance sufficient to arrive at a damages award to compensate Smith. In that plan, the government's life care planner, Sharon L. Reavis, explained that she figured Smith's expenses on the basis of medical care, drugs and therapies being available to him at no cost from the VA. This is appropriate, in light of Smith's own acknowledgement that if he had medical problems outside of the VA, he would prefer to return to the VA hospital for care. *See* T. 606–07. The plan submitted by the govern-

ment provides for all the items listed in the plaintiff's plan, with a few exceptions. For example, the cost of a van or equivalent handicapped transportation services is included in the government's plan. After meeting with Smith's treatment team, however, Reavis did not believe that Smith himself could drive, and therefore did not include the cost of a driving evaluation or driver education. Reavis eliminated the cost of a computer and computer training from Smith's life care plan as well, because Smith has had the opportunity to learn to use a computer at the VA, but has chosen not to do so. The cost of rehabilitation after tenotomy surgery was eliminated from the government's plan, because Smith has elected not to have that surgery. Conversely, Reavis included some items apparently overlooked in Cyphers' life care plan, such as batteries for Smith's electric wheelchair. T. 1469.

After a thorough review of both life care plans and the items specifically included within each plan, the Court finds that the government's life care plan providing for skilled nursing facility care best meets Smith's needs. The total cost of that plan was figured on the basis of a 15 year life expectancy; this Court has found that 12.6 years more closely mirrors Smith's actual life expectancy.

The total figure advanced by the government's life care planner to cover the cost of Smith's lifetime of care in her plan's Option A, nursing home care, is $713,573.50, which is figured on the basis of a 15 year life expectancy. Because Smith's realistic life expectancy is closer to 12.6 years, the Court has reduced the amount of the award to $599,401.73, to account for this shorter period. While the Court's method for accomplishing this goal might seem simplistic,[5] it appears to result in an appropriate figure.

4. Specifically, George Cyphers directed that any cost determination on a nursing home plan should exclude the cost of rehabilitation case management, upper trunk exerciser, Velcro weight cuffs, exercise mat platform, van and modifications, car phone, service and reinstallation, raised toilet seat, home/facility care, option A and architectural renovations. Plaintiff's Exhibit 40 at 5. To the best of this Court's ability to discern, Dr. Burke instead *included* every one of these items, making the financial report he sub-

mitted on nursing facility care at best, confusing, and at worst, useless.

5. The Court divided $713,573.50 by 15, and then multiplied that result, $47,571.566, by 12.6, to reach the above-noted total of $599,401.73. Although this approach seems simplistic, it merely assumes that inflation and growth will be roughly equal, and cancel one another out.

■ The government argues that this Court has the authority under *Hull v. United States,* 971 F.2d 1499 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1844, 123 L.Ed.2d 469 (1993), to award Smith's medical and physical care damages in the form of a trust, with a full reversionary interest in the government. While *Hull* is not binding on this Court, its reasoning is plausible, and this Court does not specifically reject it.

*Hull* also requires, however, a determination that a reversionary interest in the government is in the best interests of the plaintiff. In *Hull,* the plaintiff was an infant who had been injured by a government doctor at birth. His parents took charge of his care, and in an effort to prevent them from realizing a windfall from his damages award if the plaintiff died prematurely, the court of appeals declared that the trial court could establish a reversionary interest in the government, such that the plaintiff's parents would not benefit from his demise. In this case, the VA may, to a greater or lesser extent, be responsible for Smith's care. To allow the government then to have a reversionary interest in the sums provided for his care would allow a windfall to the government similar to that disapproved in *Hull.*

### C. Hedonic Damages

■ Finally, it is this Court's responsibility to place a value on Smith's existence as it is now, compared to what it was before March 17, 1990. Smith unquestionably is entitled to be compensated for the changes in his life, but the correct measure of that compensation is difficult to determine.

In closing argument, plaintiff's counsel urged this Court to award Smith $1000 per day for the rest of his life figured on a 22.6 year life expectancy: $9,850,000. While this Court does not intend to belittle the suffering Smith has endured and will endure, a total figure of almost ten million dollars is excessive. Smith's actual life expectancy, as discussed earlier, is 12.6 years; awarding him approximately $1000 per day on the basis of that life expectancy results in an award of $4,600,000, which seems reasonable to this Court. In light of the fact that this Court's award of compensatory damages will cover all of Smith's medical and physical needs for the rest of his life, damages in the amount of $4,600,000 for his loss of enjoyment of life is appropriate.

Obviously, no amount of money will adequately compensate Smith for the life he must now lead. Once an active, relatively healthy individual, he is now an invalid, never to be truly independent again. Smith must depend on others to care for his most basic bodily needs, and he must constantly be on guard against infections or other debilitating conditions he may not even know he has, solely because he is quadriplegic. It is appalling that Smith came to be in this condition while in the Veterans' Administration hospital, where he had every reason to expect preventive medical care, rather than heroic measures after he was already gravely ill.

All that being true, however, Smith is not entitled to an excessive award against the government. An award of $4,600,000 will provide him with a comfortably ample cushion of money, over and above the sums provided for his physical care needs, with which to do anything, or go anywhere, his physical condition does not preclude.

### IV.

### CONCLUSION

This Court finds in favor of the plaintiff, Charles Smith. The government therefore is directed to pay him $599,401.73 to compensate him for his care in a skilled nursing facility for the rest of his life, and $4,600,-000.00 to compensate him for his emotional distress and the impairment of his enjoyment of life.

IT IS SO ORDERED.