[Cite as *Robison v. Med. Univ. of Ohio at Toledo*, 2011-Ohio-5950.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROBISON,                                                    Judge Alan C. Travis

      Plaintiffs,                                         DECISION

      v.

MEDICAL UNIVERSITY OF OHIO AT TOLEDO,        Case No. 2008-10331

      Defendant.

**{¶ 1}** Plaintiffs brought this action alleging medical negligence and loss of consortium. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

**{¶ 2}** On January 17, 2007, plaintiff[1] was attempting to hang a light above a stall in a horse barn when she lost her footing and fell approximately four feet to the dirt floor below. Plaintiff sustained an open compound fracture of her left tibia and fibula at the ankle. Initially, plaintiff was taken to the emergency room at Bellevue Hospital but shortly thereafter she was life-flighted to defendant's medical center. Nabil Ebraheim, M.D., head of defendant's department of orthopedic trauma, treated plaintiff for her injuries over a ten-day period, during which time he performed multiple surgeries, including an open reduction and internal fixation of plaintiff's ankle.

**{¶ 3}** Plaintiff's ankle fracture was classified as a type 3B, meaning that there was severe soft-tissue damage with substantial environmental contamination from bacteria found in horse manure. The parties do not dispute that Dr. Ebraheim's initial

treatment of plaintiff's injuries met the standard of care. However, plaintiffs assert that as plaintiff's treatment progressed, Dr. Ebraheim was negligent when he failed to diagnose a deep tissue/bone infection which resulted in chronic osteomyelitis.

## LAW

**{¶ 4}** "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.

## MARK GOODMAN, M.D.

**{¶ 5}** Plaintiffs' first expert, Dr. Goodman, testified that he is board-certified in orthopedic surgery and that he is the chief of orthopedic surgery at the University of Pittsburgh School of Medicine. Dr. Goodman explained that osteomyelitis is an infection of the bone which can be categorized as acute, intermediary, or chronic. Dr. Goodman stated that skin contaminants such as bacteria are either Gram-positive or Gram-negative, and that specific antibiotics are prescribed to treat each type of organism. Dr. Goodman noted that in a farm setting, Gram-negative bacterias such as E. coli and Pseudomonas are prevalent. Dr. Goodman stated that plaintiff was treated with intravenous antibiotics for both Gram-negative and Gram-positive bacteria while she was in the hospital and that she was discharged on Keflex, an antibiotic which is effective against Gram-positive organisms only.

**{¶ 6}** Dr. Goodman's criticisms of Dr. Ebraheim's care begin with the office visit on March 26, 2007, when plaintiff complained of swelling, redness, and increasing

---

[1]"Plaintiff" shall be used to refer to Pamela Robison throughout this decision.

pain.[2]  Dr. Goodman opined that Dr. Ebraheim erroneously diagnosed plaintiff with a surface infection of the wound, which was, in fact, a deep infection.  In Dr. Goodman's opinion, the standard of care required a needle aspiration deep into the ankle to obtain a culture at that time.  According to Dr. Goodman, if a culture of the deep tissue had been obtained on March 26, an infection would have been diagnosed; that by failing to obtain an aspiration and culture at that time, Dr. Ebraheim allowed an infection to "brew" for two months, and that as a result, plaintiff now suffers from chronic osteomyelitis.  Dr. Goodman also opined that it was a deviation from the standard of care to continue to prescribe Keflex after March 26 and that Dr. Ebraheim failed to follow up with the results of lab tests that he ordered at the March 26 and April 12 visits.

{¶ 7}  On cross-examination, Dr. Goodman acknowledged that even with the best of care, a patient with an injury such as plaintiff's can develop chronic osteomyelitis and that the bacterial infection most likely originated at the time of plaintiff's injury.

**LARRY RUMANS, M.D.**

{¶ 8}  Plaintiffs' second expert, Dr. Rumans, testified that he is board-certified in internal medicine and infectious diseases and that he is an associate clinical professor at the University of Kansas School of Medicine.  Dr. Rumans explained that inasmuch as plaintiff sustained trauma with bone penetrating the skin, she was exposed to a contaminated environment, which can cause infection.  Dr. Rumans explained that an open reduction means moving bones and internal fixation means placing hardware.  In addition, Dr. Rumans noted that hardware itself is a foreign body and many times a slime deposit forms around the hardware which harbors bacteria.  Dr. Rumans noted that a surgical incision also creates a risk of infection because it exposes the body to contaminants.  Dr. Rumans explained that upon discharge, plaintiff was prescribed Keflex, an oral antibiotic, to prevent development of infection due to Staphylococcus aureus, a Gram-positive bacteria found on healthy skin.  Dr. Rumans explained that Keflex is not effective against Gram-negative bacteria.

{¶ 9}  Dr. Rumans opined that Dr. Ebraheim failed to meet the standard of care on March 26, when he did not obtain an aspiration and deep wound culture, did not

---

[2]All dates referenced in this decision pertain to the year 2007.

consult an infectious disease specialist, and did not start a different antibiotic treatment. Dr. Rumans opined that as of March 26, plaintiff suffered from a deep wound infection, and to assume that it was a superficial wound infection was to "ignore the origin of the injury." Dr. Rumans opined that plaintiff in all likelihood had acute osteomyelitis on March 26; that the standard of care on April 12 required Dr. Ebraheim to pursue an evaluation regarding abnormal lab values and a worsening of the inflammatory process; and that by approximately May 3, plaintiff's acute osteomyelitis became chronic.

{¶ 10} Dr. Rumans also stated that plaintiff should not have been discharged on Keflex or any other antibiotic. In his opinion, Keflex allowed Pseudomonas bacteria to progress into chronic osteomyelitis. However, Dr. Rumans acknowledged that even under the best of care, a patient with injuries such as plaintiff's can experience chronic osteomyelitis.

**NABIL EBRAHEIM, M.D.**

{¶ 11} Dr. Ebraheim, who is board-certified in orthopedic surgery, testified that on January 17, plaintiff presented with a fractured left ankle joint with the entire tibia outside the skin. Dr. Ebraheim noted that plaintiff underwent four surgeries in January as a result of her fall; that she was prescribed prophylactic antibiotics, including intravenous Ancef and Gentamicin both before and after each surgery; that plaintiff's injuries were repaired with the use of an external fixator, which includes internal hardware; that placing hardware in an area of the body that is contaminated is a risk for infection; that a known risk of placing hardware is glycocalyx, a sugary slime that the body produces which harbors bacteria that becomes resistant to antibiotics; and that he cleaned plaintiff's wound as much as possible because he knew that she was at a high risk of infection.

{¶ 12} Dr. Ebraheim explained that he prescribed the antibiotic Keflex for plaintiff upon her discharge from the medical center; that Keflex is a relatively benign antibiotic for wound management which is prescribed to suppress or avoid cellulitis; that Keflex is commonly prescribed for patients with external fixator pins to prevent skin infection from bacteria such as staph or strep; that inasmuch as plaintiff had pins placed in her ankle, she needed to stay on Keflex until the holes from the pins had healed; that Keflex is not

effective against Gram-negative bacteria found in a barnyard; and that he did not prescribe Keflex to prevent infection from Gram-negative bacteria.

{¶ 13} Dr. Ebraheim noted that he monitored plaintiff's progress from her initial surgery through follow-up visits during the months of February and March; that he performed multiple irrigations and debridements to clean the wound throughout that period of time; and that plaintiff's wounds appeared to be healing. Dr. Ebraheim stated that he was aware that plaintiff was at high risk for infection and that he monitored plaintiff for signs and symptoms of infection but that plaintiff did not show any signs of infection until her office visit of March 26, when she complained of increased pain for the previous four days, occasional shooting pain, and a purulent drainage from the wound. In Dr. Ebraheim's opinion, on March 26, plaintiff was suffering from a superficial wound infection with some localized erythema and edema. Dr. Ebraheim removed the superficial infection by debriding the tissue. He also ordered blood work and advised plaintiff to return for a follow-up visit in three days. According to Dr. Ebraheim, to obtain a culture of the surface wound would not have shown whether there was a deep infection because a surface infection and a deep tissue/bone infection are not related. When plaintiff returned for the follow-up visit on March 29, there was no drainage of the wound, no erythema noted, and the blood work was within normal limits. According to Dr. Ebraheim, at that time there were no clinical signs to suggest a deep infection. From that point forward, Dr. Ebraheim believed that plaintiff's wounds were healing, based upon findings such as those noted on April 12 (no erythema, no drainage noted, and good granulation of tissue) and his interpretation of an x-ray taken on May 3 that showed that plaintiff's fracture was healing. However on May 30, Dr. Ebraheim noted a change in plaintiff's condition, with erythema, increased pain, and a change in location of the pain to the top of the left foot and ankle. Dr. Ebraheim performed a needle aspiration and took a culture. On May 31, plaintiff called Dr. Ebraheim's office and stated that her ankle had ruptured. On June 1, Dr. Ebraheim performed surgery and discovered a deep infection of the wound involving the hardware. At that point, Dr. Ebraheim ordered an infectious disease consult and treated plaintiff with intravenous antibiotics again.

{¶ 14} Dr. Ebraheim stated that open fractures have a high incidence of infection; that the only reliable indicator to prevent infection is to administer intravenous antibiotics before and after surgery; that prolonged use of intravenous antibiotics has not been shown to improve a patient's outcome; and that a longer course of intravenous antibiotic treatment does not have any bearing on whether a deep infection will occur.

## DONALD R. GRAHAM, M.D.

{¶ 15} Defendant's first expert, Dr. Graham, testified that he is board-certified in internal medicine and infectious diseases, and that he is the chief of the division of infectious diseases at the Springfield Clinic at Southern Illinois School of Medicine. Dr. Graham stated that based upon the environment where plaintiff fell, a physician must presume that she was at risk of infection by Gram-negative bacteria, which is present in animal feces. Consequently, Dr. Graham opined that Dr. Ebraheim's use of intravenous Gentamicin, an antibiotic that treats Gram-negative bacteria, along with the use of intravenous Ancef, an antibiotic that treats Gram-positive bacteria, met the standard of care during plaintiff's initial hospitalization. Dr. Graham also opined that it was within the standard of care to prescribe Keflex upon plaintiff's discharge from the medical center, to prevent possible infection from Gram-positive bacteria, such as staph or strep.

{¶ 16} Dr. Graham opined that on March 26, it was within the standard of care to perform a debridement of plaintiff's wound without taking a culture because plaintiff's clinical presentation did not warrant a diagnosis of a deep infection at that time, and that a culture of the surface wound would not show whether she had a deep infection. Dr. Graham further opined that a deep tissue aspiration and culture was not warranted on that day, and that a culture was not warranted on March 29, either, because the wound appeared to be improving. Dr. Graham also stated that it was within the standard of care to keep plaintiff on Keflex for an extended period of time. Finally, Dr. Graham opined that on May 30, Dr. Ebraheim's decision to take a deep wound aspiration and culture was within the standard of care based upon plaintiff's clinical presentation.

## MARC SWIONTKOWSKI, M.D.

{¶ 17} Defendant's second expert, Dr. Swiontkowski, testified that he is board-certified in orthopedic medicine, and that his clinical practice in the department of orthopedic surgery at the University of Minnesota is limited to treating fractures and fracture healing problems. Dr. Swiontkowski opined that Dr. Ebraheim's entire course of treatment of plaintiff complied with all applicable standards of care. Dr. Swiontkowski explained that in a fracture sustained under circumstances such as plaintiff experienced, it is not always possible to prevent osteomyelitis and that plaintiff's injuries occurred in the highest risk category because of the environment where her injury took place. Dr. Swiontkowski stated that it was within the standard of care to perform a debridement on March 26; that there was no need for a wound culture on March 26; and that the standard of care did not require Dr. Ebraheim to obtain a deep wound aspiration and culture at that time because the clinical signs showed only a superficial infection. Dr. Swiontkowski added that on the office visit of May 30, plaintiff showed signs of some erythema, but that the x-rays looked "good" and that there was no discharge from the wound. Dr. Swiontkowski opined that it was appropriate for Dr. Ebraheim to perform an aspiration on May 30 because the wound was not reducing in size. Finally, Dr. Swiontkowski opined that the bacteria that caused plaintiff's deep bone infection was most likely acquired during her traumatic injury in a barnyard environment.

## FINDINGS AND CONCLUSIONS

{¶ 18} As with virtually all cases involving claims of medical malpractice, this case is based upon the testimony and professional opinions of medical experts. It is not unusual for experts in the medical field to disagree on the standard of care in a particular medical presentation, or whether that standard of care was met. Sincere disagreement as to whether medical treatment met the standard of care in a particular case is understandable. To prevail, plaintiffs' evidence must preponderate; that is, plaintiffs must demonstrate that it is more likely than not that defendant committed medical malpractice. Thus, the question in this case is whether the evidence and testimony of expert witnesses presented by plaintiffs is more persuasive or of greater probative value than the evidence and testimony presented against it. Upon review, the

court cannot say that plaintiffs' evidence was more persuasive, or of greater probative value than the evidence opposed to it.

{¶ 19} The court finds that the testimony of Drs. Graham and Swiontkowski was more persuasive than that of Drs. Goodman and Rumans. Therefore, the court finds that plaintiffs have failed to prove by a preponderance of the evidence that the standard of care required that a deep wound aspiration and culture of plaintiff's ankle be obtained on March 26, or that the failure to obtain such was the proximate cause of plaintiff's chronic osteomyelitis. The greater weight of the evidence shows that Dr. Ebraheim met all applicable standards of care in his treatment of plaintiff and that her clinical presentation did not warrant a deep wound aspiration or culture at any time before May 30.

{¶ 20} Plaintiff's husband has asserted a claim for loss of consortium. "[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.* (1992), 63 Ohio St.3d 84, 93. Since plaintiffs have failed to prove their claims of negligence, the loss of consortium claim must also fail.

{¶ 21} For the foregoing reasons, the court finds that plaintiffs have failed to prove any of their claims by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROBISON,

     Plaintiffs,

     v.

MEDICAL UNIVERSITY OF OHIO AT TOLEDO,

     Defendant.

Case No. 2008-10331

Judge Alan C. Travis

JUDGMENT ENTRY

{¶ 22} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
ALAN C. TRAVIS
Judge

cc:

Andrew R. Young
Ellen M. McCarthy
1370 Ontario Street, Suite 100
Cleveland, Ohio 44113-1792

Anne B. Strait
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Filed October 6, 2011
To S.C. reporter November 18, 2011