JOURNAL ENTRY and OPINION
{¶ 1} Defendant Steven Steinberg, M.D., performed gall bladder surgery on decedent John Taylor. Taylor suffered a common postoperative complication a — bile duct leak — that although suspected, went undiagnosed and led to his death. Taylor's estate brought this medical malpractice action against Steinberg, claiming his postoperative care of Taylor fell below accepted standards of care because he failed to discover and treat the duct leak. A jury returned a verdict and $1.24 million in damages to the estate. The court denied the estate's motion for prejudgment interest. Steinberg appeals claiming that the court erred by denying his motions for directed verdicts. The estate cross-appeals, claiming the court erred by denying its motion for a prejudgment interest without first holding a hearing.
{¶ 2} Civ.R. 50(A)(4) permits the court to direct a verdict when the evidence, construed most strongly in favor of the non-moving party, leads reasonable minds to but one conclusion, and that conclusion is adverse to the non-moving party. This standard is similar to that presented in a motion for summary judgment — the court must accordingly give the nonmoving party the benefit of all reasonable inferences that might be taken from the evidence. See Broz v. Winland
(1994), 68 Ohio St.3d 521, 526, 1994-Ohio-529. When there is sufficient credible evidence to permit reasonable minds to reach different conclusions on an essential issue, the trial court must submit that issue to the jury. O'Day v. Webb (1972), 29 Ohio St.2d 215, paragraph four of the syllabus. We therefore consider the facts in a light most favorable to the estate.
{¶ 3} A physician diagnosed Taylor with gallstones and referred him to Steinberg for surgery to remove the gall bladder. The surgery went without complications and Taylor left the hospital the following day.
{¶ 4} Twenty-seven days later, Taylor was readmitted to the hospital with complaints of abdominal distress and jaundice. The admitting physician suspected "biliary sepsis" as a cause of Taylor's complaint. A common postoperative complication of gall bladder removal is a bile duct leak. When bile leaks into the abdominal cavity, it irritates the soft tissue and can lead to infection — commonly known as sepsis. Although imminently treatable, this condition can be deadly if not treated. Like the admitting physician, Steinberg immediately suspected that Taylor had a duct leak.
{¶ 5} A doctor attending to Taylor's admission (Steinberg was away for the weekend) ordered a CT scan. A positive CT scan would show the presence of bile and confirm the existence of a duct leak. Taylor's CT scan did not reveal the presence of any fluid. Steinberg ordered a second CT scan six days after the first scan. This scan was likewise negative. The day after the second CT scan, Steinberg ordered an ERCP test. The ERCP test requires a doctor to insert a scope down the patient's throat to where the bile duct joins the intestine, squirt dye into the duct, and take an x-ray to find the source of the leak. Taylor expressed reservations about the procedure, and Steinberg conceded that the ERCP is not the most pleasant test. The gastroenterologist who performed the test heavily sedated Taylor, but Taylor still did not tolerate the test very well. Only one decent x-ray was generated by the test, but Taylor's inability to tolerate the test meant that the gastroenterologist was unable to fill the bile duct with enough dye so that he could draw any conclusions about the problems with the duct. Steinberg found the test unhelpful.
{¶ 6} Steinberg then wanted Taylor to undergo a percutaneous trans-hepatic cholangiogram (PTHC). This test requires the physician to insert a needle with dye through the abdominal wall and into the liver. Taylor balked at this procedure and said that he wanted to wait two days. Steinberg said that he impressed upon Taylor the importance of the procedure, indicating to him that the longer the wait, the greater the risk. When Taylor asked Steinberg for other options, Steinberg said that the only other option was a reoperation.
{¶ 7} Taylor consented to the PTHC, but the radiologist who performed the test was unable to put the needle into any of the bile ducts in the liver. The test failed. However, the report prepared after the PTHC showed that the needle removed from Taylor showed the presence of a small degree of ascites with a yellowish tinge, indicating that bile had been leaking as suspected by Steinberg. Steinberg did not see this report, although a notation on the report showed that it had been electronically signed the day after the procedure.
{¶ 8} At this point, Steinberg said that he advised Taylor that a reoperation was necessary. The gastroenterologist believed that they could wait one week and perform another ERCP. Privately, Steinberg disagreed, but he respected the gastroenterologist's opinion and agreed to defer any surgery for one week. Meanwhile, Taylor had become angry and frustrated at the failure to pinpoint the cause of his abdominal distress. He told Steinberg that he wanted a second opinion. Steinberg gave Taylor the names of four other doctors. Taylor himself suggested a test, a magnetic resonance cholangiography. Steinberg asked the radiologist to speak with Taylor.
{¶ 9} After speaking with the radiologist, Taylor decided that he wished to leave the hospital. Steinberg told Taylor that he believed there were two treatment options: have an immediate operation or wait one to two weeks and repeat the ERCP and PTHC. Steinberg said that he personally believed that a "reoperation" was indicated and that he told Taylor that a duct leak could potentially be fatal if not treated. But he failed to note these facts on Taylor's chart. Despite Steinberg's continued belief that Taylor had a duct leak, the discharge papers said that the principle diagnosis was "abdominal wall hematoma."
{¶ 10} In his discharge summary, Steinberg gave a more detailed account of Taylor's admission to the hospital. He was admitted, in part, to rule out "common bile duct injury, cystic duct leak or retained bile duct stone." The discharge summary detailed the various tests performed, noting that they were unsuccessful. Steinberg noted that he and Taylor had "extensive discussions" about the available options, and that "he and I both agreed that the thing to do would be to wait and try to repeat the [ERCP]." The final diagnosis said that "the cause was not determined."
{¶ 11} Taylor received an ordinary discharge with instructions to see Steinberg in one week. Steinberg knew that he could have discharged Taylor with a notation that the discharge had been "against medical advice." Physicians use this notation to indicate that the patient has demanded discharge in the face of contrary medical advice. Steinberg said that he did not label the discharge as being against medical advice for two reasons: (1) given the already poor relationship between him and Taylor he thought that Taylor might stop seeking medical treatment from any doctor and (2) he knew that some health insurers would reject any claims for benefits if the patient refuses to follow medical advice. At trial, Steinberg allowed that in retrospect, he should have marked the discharge as being against medical advice.
{¶ 12} Two days later, Taylor was admitted to another hospital where doctors immediately performed a HIDA scan and drained five liters of bile from Taylor. The doctors also performed an ERCP and located the duct leak. All efforts to treat the sepsis were unsuccessful, however, and Taylor died one month later.
 I
{¶ 13} The elements of an actionable claim of negligence are (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, and (3) such breach was the proximate cause of plaintiff's injuries. Chambers v. St. Mary's School (1998), 82 Ohio St.3d 563,1998-Ohio-184. Steinberg's assignments of error claim the court erred by denying motions for directed verdicts because the estate failed to produce evidence that Steinberg breached a standard of care and that the breach of a standard of care was the proximate cause of Taylor's death.
 A
{¶ 14} Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 346 N.E.2d 673
holds that when evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in performance of a service, either did some particular thing or things that physicians in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would not have done under the same or similar circumstances.
{¶ 15} Both the estate's expert and Steinberg himself stated that the standard of care required Steinberg to diagnose and treat the duct leak. At this point, it bears mentioning that Steinberg had not been accused of any negligence in the initial gall bladder surgery. All the experts agreed that a duct leak could naturally occur in a patient without fault on the part of the surgeon. The issue of breach of care was limited solely to the failure to diagnose and treat the duct leak.
{¶ 16} Reasonable minds could find that Steinberg failed to diagnose the duct leak even though he had strong suspicions that a duct leak existed. Steinberg's suspicions led to three different tests a — CT scan, an ERCP and a PTHC (a prior CT scan had been conducted on Taylor's admission to the hospital, before Steinberg had the opportunity to see him). Each test failed to disclose what Steinberg knew had to exist, although the report of the PTHC suggested the presence of bile in the abdomen as suspected. Steinberg remained convinced enough of the presence of a duct leak that he suggested that Taylor undergo additional tests and even a reoperation.
{¶ 17} Steinberg claims this evidence showed that he did diagnose a duct leak but that Taylor refused additional treatment. If Steinberg did have a firm belief in the existence of a duct leak, he failed to note that fact in any of the documentation created at the time of treatment. While Steinberg testified that he and Taylor spoke repeatedly about Taylor's need to undergo further testing to determine the cause of the duct leak, the medical records belied this. The discharge summary showed that "he and I both agreed that the thing to do would be to wait and try to repeat the [ERCP]." There is no mention of a reoperation or Steinberg's reservations about waiting an additional week for further testing. And there was nothing in the record to show that Steinberg was able to convey the seriousness of waiting a week despite actively leaking bile. The seriousness of the duct leak, and its life-threatening potential, made it reasonable to assume that Taylor's chart would have some indication, or even a suggestion, that Steinberg had fully advised Taylor of the consequences of refusing additional testing.
{¶ 18} To underscore this point, the estate convincingly argued that a physician in Steinberg's shoes, having a patient with a suspected duct leak, would only have discharged the patient with a notation that the discharge was against medical advice. Steinberg himself admitted that he erred by failing to make the against medical advice notation on the chart. Of course, the failure to label the discharge as being against medical advice was not a breach of care. The absence of the "against medical advice" notation simply undercut Steinberg's claim that he recognized the seriousness of Taylor's situation. It also created the inference that Taylor was not informed of the seriousness of his condition such that his decisions about his own care were fully informed. So the jury could infer that Steinberg's failure to document a duct leak as the source of Taylor's complaints and his failure to put up a greater protest over his discharge from care meant that Steinberg did not fully appreciate the gravity of the situation.
{¶ 19} Finally, the estate presented sufficient evidence to show that Steinberg could have ordered additional tests to discover the source of the duct leak. Most prominently, the estate argued that a HIDA scan might have disclosed the source of a leak and a third CT scan would have shown the accumulation of bilious fluid.
{¶ 20} Steinberg argued that he knew a leak existed and needed to conduct tests that would find the source of the leak — something neither the HIDA scan nor the CT scan would discover. But Steinberg was unable to explain that just two days after Taylor's discharge, the admitting physicians conducted a HIDA scan and found five liters of bile in Taylor. The jury could rationally infer that this quantity of fluid did not accumulate in just two days and that had Steinberg conducted the same tests, he would have discovered the bile. Again, the inference arose that Steinberg did not fully appreciate the gravity of the situation, or he did not conduct sufficient tests to enable him to have a clear idea of the situation when he agreed to discharge Taylor.
{¶ 21} We are aware that Steinberg presented a good deal of evidence to show that he did appreciate the need to find the source of the bile leak. In fact, a different trier of fact might have looked at his actions in the context of Taylor's reluctance for treatment and found no fault in how he handled the case. However, the very strict standard of review employed for motions for directed verdicts is such that if any
reasonable trier of fact might come to different conclusions on the evidence, the court must refuse to direct a verdict. Steinberg's failure to document the duct leak as a cause of Taylor's complaints, and his failure to protest the discharge as being against medical advise, created an inference of a breach of care. The court could not ignore those inferences when ruling on the motion for a directed verdict.
{¶ 22} Steinberg also argues that his breach of care in failing to diagnose and treat the duct leak was not the proximate cause of Taylor's death because Taylor refused further testing and a reoperation. He points to evidence that his relationship with Taylor had deteriorated to the point that he believed Taylor wanted nothing more than to go home, and that Steinberg's refusal to agree with a discharge might have led Taylor to refuse any further medical care.
{¶ 23} Although the parties agreed that Taylor was a difficult patient and may not have been receptive to further testing, the evidence did not show that he actively refused a reoperation. Taylor's daughter testified to his frustration over not being made better and that he wanted something done. Steinberg had to agree that nothing in Taylor's chart showed that he actively refused treatment. Aside from his own testimony, Steinberg was unable to show by objective evidence that he had impressed upon Taylor the need for further testing or a reoperation as being life and death.
{¶ 24} The jury was free to infer that Taylor would not have refused a reoperation had he been told that to do so might kill him. Taylor's expert said as much and Steinberg now claims the expert made this statement as pure speculation and without the needed certainty to establish a breach of the standard of care.
{¶ 25} Obviously, Taylor'sexpert could not testify to Taylor's decision-making process — Taylor's state of mind — at the time he began having difficulties with Steinberg. The expert's testimony simply undescored what many would consider a point of common sense. The desire to live is such that persons facing a life-threatening situation will choose the treatment path that leads to life, not death. Taylor's daughter testified to this fact when she said that Taylor told her he wanted to get better. If Taylor's stubbornness was such that Steinberg could not proceed with the testing required to rule out a duct leak, he should have noted that fact on the patient's record by labeling Taylor's discharge as being against medical advice.
{¶ 26} A serious flaw with Steinberg's argument about appreciating the serious consequences Taylor faced by refusing a reoperation was that the evidence showed that Steinberg did not believe that Taylor was in any imminent danger at the time of discharge. Steinberg considered that Taylor's condition had improved to the point where he could be safely discharged. Taylor's bilirubin levels, an indication of the amount of sepsis in his system, had fallen by half, although they were still six times the normal levels. Taylor also appeared to have regained strength and appetite. At the time, Steinberg believed that the only impediment to Taylor's discharge was his very low fluid intake. That concern disappeared after Taylor ate a full breakfast. The discharge went forward with no worries about the duct leak.
{¶ 27} The jury could infer that Taylor's stubbornness did not affect Steinberg's decision to discharge him, as Steinberg did not think that Taylor was in imminent danger at the time. Sadly, this was proved erroneous by the five liters of bile drained from Taylor just two days later. All of these facts just discussed created inferences that would cause reasonable minds to disagree on the evidence. We cannot say the court erred by refusing to direct a verdict for Steinberg.
 II
{¶ 28} For its cross-appeal, the estate raises issues relating to its motion for prejudgment interest. The court originally scheduled the motion for an oral hearing, and the parties began engaging in discovery relating to prejudgment interest issues.
Without explanation, the court denied the motion for prejudgment interest just five days before the scheduled oral hearing. The estate claims the court not only erred by denying the motion, but erred by refusing to hold an oral hearing.
{¶ 29} R.C. 1343.03(C) states:
 {¶ 30} (C) Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.
{¶ 31} We have not interpreted the R.C. 1343.03(C) mandate that the issue of prejudgment interest be determined by a hearing to require an oral hearing. See, e.g., Rose v. The Nat. Mut. Ins. Co. (1999),134 Ohio App.3d 229, 246. Civ.R. 7(B)(2) provides for a court to "make provision by rule or order for the submission and determination of motions without oral hearing upon brief written statements of reasons in support and opposition" in order to expedite its business. The purpose of the rule is to "dispense with an oral hearing on motions." See Staff Notes to Civ.R. 7(B)(2). Rule 11(A) of the Cuyahoga County Court of Common Pleas incorporates Civ.R. 7(B)(2) by providing that motions, in general, shall be submitted and determined upon the motion papers. The Ohio Supreme Court has adopted this view in prejudgment interest cases. In Galmish v.Cicchini, 90 Ohio St.3d 22, 33, 2000-Ohio-7, the Court stated that the trial court must hold a hearing on a motion for prejudgment interest, but went on to note that under the facts before it a hearing on prejudgment interest had been held when the trial court relied exclusively on counsels' briefs and oral arguments. The "oral arguments" of counsel are not evidentiary in nature, so the trial court in Galmish was really relying on nothing more than what had been submitted on briefs, explicated by counsel. We see no practical distinction between a hearing solely on the briefs and oral arguments in addition to the briefs.
{¶ 32} In the end, if the motion for prejudgment interest is obviously not well taken, the court can deny the motion for prejudgment interest without conducting an oral hearing. Fazio v. Meridian Ins. Co. (Apr. 9, 1998), Cuyahoga App. No. 73320; Werner v. McAbier (Jan. 13, 2000), Cuyahoga App. Nos. 75197 and 75233. Because the decision not to hold an oral hearing is based on the evidence presented in the motions, the court's decision to hold an oral hearing is within its broad discretion, just as if it were determining whether a party had made a good faith offer to settle. See Huffman v. Hair Surgeon, Inc. (1985),19 Ohio St.3d 83.
{¶ 33} The objective facts submitted with the motion for prejudgment interest were that the estate made a "very negotiable" demand of $2 million. Steinberg made no offer of settlement and, in fact, made no communication to the estate on the issue. In his opposition to the motion for prejudgment interest, Steinberg said that he rationally reviewed the facts of the case and came away believing that he bore no liability whatsoever. There has been no allegation that other facts demonstrated bad faith, such as delaying discovery or impeding the trial.
{¶ 34} The issue boils down to whether Steinberg's refusal to make any offer of settlement constituted bad faith.
{¶ 35} When a party has a good faith, objectively reasonable belief that he has no liability, then that party need not make a monetary settlement offer. Kalain v. Smith (1986), 25 Ohio St.3d 157, syllabus. The court, in the scope of its discretion, could have found that Steinberg refused to make a monetary offer of settlement in good faith and with an objectively reasonable belief that he had no liability. As we pointed out earlier in our discussion of the assignments of error relating to the directed verdicts, reasonable minds could have differed on the state of the evidence. A finding that the court did not err by refusing to direct a verdict demonstrates this point, as there was evidence going both ways — this is what created a factual issue for the jury. Just because the jury decided adversely to Steinberg is by no means dispositive of the reasonableness issue for purposes of prejudgment interest. The issue is what was objectively reasonable, not what the jury happened to find.
{¶ 36} The court could consider the evidence as a whole and find that Steinberg might not have had any liability under the circumstances. We cannot say the court abused its discretion by denying the motion for prejudgment interest, and doing so without an oral hearing. The cross-assignments of error are overruled.
Judgment affirmed.
It is ordered that plaintiff-appellee/cross-appellant recover of defendants-appellants/cross-appellees her costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, J., CONCURS. COLLEEN CONWAY COONEY, J., CONCURS INPART AND DISSENTS IN PART WITH SEPARATE OPINION.