OPINION
{¶ 1} Plaintiff-appellant April Plummer appeals from a judgment rendered in favor of defendant-appellee Wayarene Harlan, M.D. in a medical malpractice action, and also from the denial of her motion for a new trial. Plummer contends that the jury's verdict finding that Harlan was not negligent is not supported by the weight of the evidence, and that the trial court therefore erred in denying her motion for a new trial.
 {¶ 2} We conclude that there is evidence in the record upon which a reasonable juror could find that Harlan met the standard of care at all relevant times. Therefore, we conclude that the trial court did not err in denying the motion for new trial. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} April Plummer delivered her first child at Good Samaritan Hospital on July 11, 1998. When the baby was delivered, he was limp, blue and not breathing. He was immediately resuscitated, stabilized and transferred to Children's Medical Center in Dayton and was subsequently diagnosed with cerebral palsy.
 {¶ 4} In 1999, Plummer filed suit against Richard G. Scharrer and Wayarene A. Harlan, the two obstetricians who attended her during labor and delivery, as well as the practice with which they were affiliated, Life Stages Samaritan Center for Women, Inc. (Life Stages). Scharrer was subsequently dismissed from the action. The matter was tried before a jury. The evidence adduced at trial established the following facts.
 {¶ 5} On July 10, 1998, April Plummer was admitted to Good Samaritan Hospital for the delivery of her child. Her prenatal care had been provided by obstetricians affiliated with Life Stages. Upon admission, a biophysical profile test was performed. The test resulted in a score of two out of a possible eight points, which indicated the necessity of further evaluation to assess fetal well-being. A fetal monitor was attached, and the fetal heart rate was deemed reassuring. From the time of her admission until approximately 7:30 a.m. on July 11, Plummer was attended by Dr. Scharrer.
 {¶ 6} At 12:30 a.m. on July 11, Scharrer checked Plummer's cervix, which was dilated to approximately six centimeters. At 1:30 a.m., Plummer's membranes ruptured, and the fluid was noted to be lightly stained with meconium. Upon examination at 3:45 a.m., Plummer remained at six centimeters. Since Plummer's labor was slow, she was started on Pitocin at 4:22 a.m. to improve her progress. She progressed to eight centimeters of dilation around 8:00 a.m.
 {¶ 7} Dr. Harlan took over Plummer's care from Scharrer at 8:04 a.m., and instructed Plummer that due to the prolonged labor, delivery might have to occur by caesarean section. Harlan instructed Plummer to begin pushing.
 {¶ 8} Plummer became fully dilated at ten centimeters by 11:17 a.m., and she continued to push until 1:22 p.m., when Harlan utilized a vacuum extractor in an effort to assist with delivery. Harlan unsuccessfully attempted four vacuum extractions until 1:29 p.m. Thereafter Plummer was instructed to resume pushing. Plummer continued to push for thirty minutes, when Harlan again applied the vacuum extractor, unsuccessfully, at 2:01 p.m.
 {¶ 9} The fetal monitor began to exhibit deep variable decelerations, a sign of possible fetal distress, which caused Harlan to seek a quick delivery. Harlan continued to allow Plummer to push because the baby's head was crowning and delivery appeared imminent. The pushing continued for approximately another twenty-six minutes, when Harlan proceeded to apply forceps to assist delivery. The baby was delivered at 2:31 p.m.
 {¶ 10} John Elliot, M.D. testified on behalf of Plummer. He opined that Harlan deviated from the standard of care by failing to perform a caesarean section at 8:23 a.m. on July 11. He further testified that Harlan deviated from the standard of care by not effecting delivery after her first four attempts at vacuum extraction failed, and by permitting Plummer to push after the fifth vacuum extraction failed.
 {¶ 11} Harlan's expert witness, Mark Landon, M.D., testified that Harlan did not deviate from the standard of care when she did not perform a caesarean section earlier in the day. Landon further testified that Harlan did not violate the standard of care at any point during the labor and delivery. Landon testified that prolonged labor like Plummer's does not pose a significant threat to a fetus unless hypoxia — oxygen deficiency — occurs. He testified that the primary indicator for hypoxia is the fetal heart monitor tracings, which would show repetitive late heart rate decelerations if the fetus were suffering from hypoxia, and that the fetal heart monitor tracings did not show any late decelerations even after 2:00 p.m. — a fact admitted by Plummer's own expert. Landon testified that given the fetal heart monitor tracings, Harlan's actions were reasonable.
 {¶ 12} Following the conclusion of the trial, the jury returned a unanimous verdict in favor of Harlan and Life Stages. In answering the verdict interrogatories, the jury found that Harlan was not negligent in her care and treatment of Plummer. Plummer filed a motion for a new trial, which was denied. From the adverse judgment rendered against her, and from the denial of her motion for a new trial, Plummer appeals.
 II {¶ 13} Plummer's First Assignment of Error is as follows:
 {¶ 14} "The Trial Court Erred In Overruling Plaintiff-appellants' Motion For A New Trial."
 {¶ 15} Plummer's Assignment of Error centers on the argument that the evidence does not support the jury's finding that Harlan met the standard of care. Plummer contends that both her expert and Harlan's expert gave testimony to the effect that Harlan did, in fact, deviate from the standard of care. She contends that the jury's finding that Harlan met the standard of care was therefore against the manifest weight of the evidence, and the trial court therefore erred by failing to grant her motion for a new trial.
 {¶ 16} Under Civ.R. 59(A)(6), a new trial may be granted if the judgment is not sustained by the weight of the evidence. As this court has stated in Pryor v. Tooson, Clark App. No. 2002-CA-91,2003-Ohio-2402:
 {¶ 17} "The general standard applied in this situation is that `[a]n order granting or denying a motion for new trial should not be reversed on appeal absent an abuse of discretion.' Abuse of discretion * * * implies that the court's attitude is unreasonable, arbitrary, or unconscionable. However, we have stressed on various occasions that decisions are unreasonable if they are not supported by a sound reasoning process.
 {¶ 18} "In deciding whether a judgment is sustained by the weight of the evidence, the standard for civil cases, taken from the criminal context, is that:
 {¶ 19} "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Id., citations omitted.
 {¶ 20} "The law imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances." Berdyck v. Shinde 66 Ohio St.3d 573, 579, citing Bruniv. Tatsumi (1976), 46 Ohio St.2d 127, 130. "Whether negligence exists is determined by the relevant standard of conduct for the physician [and that] standard is proved through expert testimony." Id.
 {¶ 21} During trial, Landon testified that the standard of care is defined as what a physician would do when faced with a similar set of clinical circumstances. As set forth above, he also testified that Harlan met the standard of care at all times, and that she proceeded in a reasonable manner.
 {¶ 22} Plummer attempted to impeach this testimony with the following questions on cross-examination:
 {¶ 23} "Q: And in most instances, Doctor, when a vacuum does not get the job done, you move right to forceps, don't you?
 {¶ 24} "A: Forceps or a C-Section.
 {¶ 25} "Q: And if the mother can't deliver after the vacuum fails with another contraction or two, you yourself would be going right away to forceps; would you not?
 {¶ 26} "A: If I thought I could accomplish it safely, yes.
 {¶ 27} * * *
 {¶ 28} "Q: * * * that's not what you would have done at two o'clock in the afternoon. You would not have waited twenty-six minutes to apply forceps, would you?
 {¶ 29} "A: I think I would've put the forceps on as soon as I could.
 {¶ 30} "Q: * * * if a mother can't deliver with another contraction or two, you'd be going to forceps right then?
 {¶ 31} "A: If I thought I could accomplish it, yes.
 {¶ 32} * * *
 {¶ 33} "Q: [The forceps were not applied until] twenty-six minutes after Dr. Harlan has failed to effect a delivery with the vacuum extractor; is that right?
 {¶ 34} "A: I think that's true.
 {¶ 35} "Q: And that's not what you would have done, is it?
 {¶ 36} * * *
 {¶ 37} "A: I think I would've put the forceps on as soon as I could.
 {¶ 38} "Q: So, Dr. Harlan didn't do what you would have done; is that right?
 {¶ 39} * * *
 {¶ 40} "A: I think there was a delay in — in applying the forceps, if that's what you're getting to.
 {¶ 41} "Q: No, just — I just . . .
 {¶ 42} "A: What I would've done — well, let me look at it and tell you. I mean, I would have gone to the forceps after the vacuum.
 {¶ 43} * * *
 {¶ 44} "A: And probably shortly thereafter.
 {¶ 45} "A: Not long after the vacuum failed, I would've attempted forceps.
 {¶ 46} "Q: You would have done it right away, wouldn't you?
 {¶ 47} "A: Well, I don't know what — right away — within a few minutes, yes.
 {¶ 48} * * *
 {¶ 49} "Q: And I believe that you rendered an opinion that Dr. Harlan met the standard of care at two o'clock, when she allowed this woman to push without going to forceps right away, did you say that?
 {¶ 50} "A: I think I did.
 {¶ 51} "Q: Okay. And yet, even though you have opined to the Jury that Dr. Harlan met the standard of care by not going to forceps right away, you, yourself, would have done that?
 {¶ 52} "A: Well, I think I've testified that with a failed vacuum, I would have gone to the forceps. You asked me what I would have done and I responded.
 {¶ 53} "Q: And my only question to you is, you're testifying as to the standard of care and what you've told the jury what you would have done was certainly within the standard of care; is it not?
 {¶ 54} "A: I think so.
 {¶ 55} "Q: But what Dr. Harlan did is not within the standard of care?
 {¶ 56} "A: I think that some delay in getting the forceps on for some reason or another, in her getting the forceps to the room. I don't . . .
 {¶ 57} "Q: You . . .
 {¶ 58} "A: I don't know that it — I don't know that it would have made a tremendous difference in the outcome or any significant difference * * *".
 {¶ 59} Plummer contends that Landon's testimony that he would have used the forceps within a few minutes indicates that Harlan deviated from the standard of care. She further argues that a reasonable juror could only reach the conclusion that Harlan did not meet the standard of care by waiting for twenty-six minutes before using forceps, and that the jury must have ignored the testimony regarding the standard of care in order to reach a defense verdict. We disagree.
 {¶ 60} The trial court, in denying the motion for a new trial, stated:
 {¶ 61} "[Plummer's] motion cannot be granted unless this [court], irrespective of any difference of opinion with the jury's verdict, concludes that the verdict was manifestly against the weight of the evidence because the verdict was not supported by competent and substantial evidence. The Court simply cannot reach this conclusion.
 {¶ 62} "A reasonable jury could have concluded, given Dr. Landon's cross-examination testimony and the testimony of [Plummer's] expert, Dr. John Elliott, that Dr. Harlan's decision concerning when she used forceps was a violation of the standard of care, but a reasonable jury could have — and evidently did — conclude, in light of the tracings and Dr. Harlan's explanation, that she did not violate the standard of care. Again, the issue is not this [court's] opinion, but whether the jury's answer to Interrogatory No. 1 was supported by competent, substantial and credible evidence so that it cannot be said that the interrogatory answer was manifestly against the weight of the evidence. Under this standard, [Plummer's] Rule 59(A)(6) motion for a new trial must fail."
 {¶ 63} From our review of the entire record, we note that Landon's testimony on cross-examination sets forth how he would have reacted personally. However, he also clearly testified that, given the tracings from the fetal heart monitor, Harlan did not violate the standard of care by delaying her use of the forceps. From reading Landon's entire testimony, we understand him to have testified that while his decision to use forceps sooner would have been within the standard of due care owed by an attending physician to Plummer, Harlan's actions were also within the standard of due care. It is clear from the record that Landon testified that his course of action — what he would have personally done — was not the only action falling within the standard of due care.
 {¶ 64} Implicit in Plummer's argument is the contention that in any given medical situation there is but one, unique course of action that lies within the duty of care owed to a patient. We reject this contention. Different physicians may make different decisions regarding the care to be given to their patients. Some of these decisions may be better than others. Some physicians may consistently make better decisions than others, and those physicians may rightly be judged to be superior. Although some of the inferior decisions regarding medical care may lie outside the duty of care owed to a patient, we reject the contention that all inferior decisions lie outside that duty. To hold otherwise would be to hold that every physician who is, even occasionally, unable to make the best decision in a medical situation necessarily commits medical malpractice on those occasions. Only the very best physicians in any medical field would be incapable of avoiding malpractice; all but the very best would be deemed to routinely commit medical malpractice whenever their practice deviated from that of the best physicians in their field, with less than optimum results. Although the duty of care a physician owes to a patient is high, it is not so high that only the very best physicians in any given field are capable of attaining it.
 {¶ 65} Based upon our review of the record, we agree with the trial court that there was sufficient, credible evidence upon which a reasonable juror could find that Harlan did not deviate from the standard of due care. Therefore, we cannot say that the trial court's decision to deny Plummer's motion for a new trial was error.
 {¶ 66} The First Assignment of Error is overruled.
 III {¶ 67} Plummer's Second Assignment of Error is as follows:
 {¶ 68} "The Jury's Verdict And Finding In Interrogatory #1 That Defendant Harlan Did Not Deviate From The Standard Of Care Was Against The Manifest Weight Of The Evidence."
 {¶ 69} In this Assignment of Error, Plummer again argues that the jury's finding is against the manifest weight of the evidence. For the reasons set forth in Part II, above, we find this argument without merit. Accordingly, the Second Assignment of Error is overruled.
 IV {¶ 70} Both of Plummer's Assignments of Error having been overruled, the judgment of the trial court is affirmed.
WOLFF and GRADY, JJ., concur.