OPINION
{¶ 1} Plaintiff-appellant Joseph Duponty (and family) appeals from the jury verdict entered in favor of defendant-appellee Athanasios Kasamias, M.D. and the decision of the Mahoning County Common Pleas Court denying a motion for new trial after such verdict. The issues are whether the jury's verdict was against the manifest weight of the evidence, whether the trial court should have granted a new trial based upon weight of the evidence, whether the jury ignored the court's instruction on standard of care and instead relied on an allegedly inadequate standard set forth by appellee's expert, and whether the court should have reduced the discovery deposition fees of appellee's expert. For the following reasons, the jury verdict is upheld, and the trial court's decision refusing to reduce the deposition fees is upheld as well.
 STATEMENT OF THE CASE {¶ 2} On August 17, 2000 at 9:30 p.m., appellant broke his right leg while working in his garage at home. (Tr. 80). He was taken to St. Elizabeth Health Center's emergency room by ambulance. X-rays showed a closed fracture to the lower right tibia and fibula; the break to the tibia caused a spirality, and the break to the fibula resulted in a floating "butterfly" fragment. Appellee was the orthopedic surgeon on call at the time. He ordered appellant's admission into the hospital by telephone. (Tr. 149).
 {¶ 3} Appellee examined appellant the next morning. Appellant was in a long-leg splint. Thus, appellee did not examine the leg due to his fear of the pain and movement that would occur. (Tr. 155, 248). Appellee spoke to appellant about open reduction and internal fixation [ORIF] surgery to repair the bones with plates and screws. The surgery could not commence immediately due to problems stabilizing appellant's blood pressure.
 {¶ 4} Appellee began the nearly four-hour surgery just before 9:00 p.m. on August 18, 2000. Intra-operative x-rays were taken, which the radiologist later described as portraying anatomic alignment. Appellee's operative note mentioned difficulty closing due to swelling. After surgery, appellee placed a loose short-leg cast on appellant's leg for a few days and checked on appellant while he was hospitalized. (Tr. 257). *Page 3 
 {¶ 5} Upon returning home, appellant was instructed to keep all weight off the leg and keep it elevated. (Tr. 94). A few days later, appellant suffered chest pains and shortness of breath. He was hospitalized for a couple days for what turned out to be an anxiety attack. (Tr. 96).
 {¶ 6} Appellant attended office visits with appellee on September 1 and 11, 2000, where more x-rays were taken. Appellee retained his order of no weight bearing on the leg and referred appellant to Dr. Cutrona for an infectious disease consult due to a problem with wound healing. Appellant began treatment with Dr. Cutrona. Rather than returning for his next visit with appellee, appellant transferred his orthopedic care to Dr. Solmen. Dr. Cutrona's notes indicated that Dr. Solmen was happy with the internal fixation device situation. (Tr. 557). Dr. Solmen also advised appellant to give the healing more time. (Tr. 102).
 {¶ 7} At the end of September 2000, appellant fell in his yard while trying to visit his animals, which included tigers, lions, bears and deer. In attempting to protect his injured right leg, he landed hard on his left knee. (Tr. 137). Dr. Solmen later advised that this caused appellant to tear the meniscus in his left knee. (Tr. 138). At that time, Dr. Solmen continued the order of no weight bearing for the right leg.
 {¶ 8} On October 20, 2000, appellant sought yet another opinion from Dr. Walker, an orthopedic surgeon associated with the Cleveland Clinic. Dr. Walker's initial office visit note reported that there was good alignment. (Tr. 415). He said that the lack of bone healing was unsatisfactory. Still, he recommended some weight bearing, meaning allowing pressure on the leg by using it to bear the body's weight. (Tr. 321).
 {¶ 9} While weight bearing, appellant's fracture shifted. (Tr. 330). On October 25, 2000, appellant arrived at Forum Health's emergency room where x-rays revealed that his plate was no longer attached to the tibia. (Tr. 695). He was transferred to the Cleveland Clinic where Dr. Walker performed another ORIF surgery on the leg. Dr. Walker discovered a staph infection which had dissolved some bone. (Tr. 332-333). He cleaned the bone and replaced the hardware using a longer fibula plate. (Tr. 345).
 {¶ 10} While hospitalized, two other operations were performed for cleaning purposes. (Tr. 301, 335). Then, in December 2000, a bone graft surgery was performed in order to fill the hole left by the infection. (Tr. 358). Another surgery was *Page 4 
done to try to close the soft tissue wound, which was not healing properly. (Tr. 356). This did not work, and a plastic surgeon was consulted. (Tr. 360).
 {¶ 11} In May 2001, appellant developed a second infection, which notes from Dr. Walker and the infectious disease staff at the Cleveland Clinic opined was probably the result of appellant's work with exotic animals. (Tr. 126-127, 410). Another ORIF surgery was performed where the hardware was replaced again. (Tr. 363). Two surgeries for further cleaning of the site were performed while appellant was hospitalized. (Tr. 366).
 {¶ 12} Thereafter, appellant received surgery on the left knee that he injured in the September 2000 fall from his crutches. (Tr. 370). Dr. Walker ordered physical therapy for both legs. (Tr. 404). The physical therapist broke appellant's right tibia while manipulating his leg. (Tr. 372). Dr. Walker thus performed another surgery; this time inserting a rod into appellant's leg. (Tr. 373). It is also said that appellant's right ankle joint has developed problems which will require ankle fusion in the future. (Tr. 384-386).
 {¶ 13} On January 18, 2002, appellant and his family filed a medical malpractice action against appellee. St. Elizabeth Health Center was also named as a defendant, but they settled just before trial. Certain issues were encountered regarding the discovery deposition of appellee's expert, Dr. Lee. (The detailed procedural history of this discovery matter is reserved for our discussion under assignment of error number three.) The jury trial against appellee commenced on February 27, 2006 and lasted six days.
 {¶ 14} Dr. Walker testified as appellant's expert. He outlined various alleged instances of appellee's negligence. First, he opined that appellee negligently began surgery during a peak period of swelling and while fracture blisters existed. (Tr. 391). He cited a radiology report and two nurses' notes mentioning pre-operative swelling. He stated that appellee should have splinted the injury for a few weeks to allow the swelling to go down before surgery or performed surgery only on one side of the leg until the swelling and blisters resolved. (Tr. 281-284).
 {¶ 15} Second, Dr. Walker testified that appellee performed the surgery negligently by failing to achieve rigid fixation or proper reduction and alignment. (Tr. 286-287, 316, 398). He concluded that the alignment was crooked. (Tr. 286, 302, 311, 319). Yet, he admitted that his notes describe the alignment as adequate. (Tr. *Page 5 
322). He stated that near-anatomic alignment was the standard of care; however, he later seemed to require actual anatomic alignment. (Tr. 302, 425). As for reduction, Dr. Walker found negligence due to the leaving of gaps which delay healing. (Tr. 298, 300, 317). He also noted the using of a plate and screws that were too short, but he specified that this was not negligence. (Tr. 345). Dr. Walker said that stable or rigid fixation is the standard of care and opined appellee failed to achieve this here or at least that appellee fixed the bones in a malreduced state. (Tr. 397-398).
 {¶ 16} Third, Dr. Walker stated that appellee negligently decided to place a cast on appellant's leg after the surgery, which increased his risk for skin damage. (Tr. 288-289). He then concluded that appellant's post-operative problems were the proximate result of appellee's negligent care (besides the anxiety attack and the torn left knee).
 {¶ 17} Appellee testified that he has been an orthopedic surgeon since 1981. He stated that the swelling noticed by the radiologist could have been due to the deformity and that the nurses could not have seen swelling of the leg on the day of surgery because the leg was in a splint. (Tr. 169, 173-174). He explained that he could not remove the splint to check for swelling until appellant was under general anesthesia. (Tr. 155, 248). He disclosed that there is always swelling with this type of injury and opined that the swelling was in fact not excessive at the time of surgery. (Tr. 189-192, 213). He also explained that the surgery itself helps decompress the swelling. (Tr. 196, 206). He stated that he could not have left appellant to wait it out, opining that surgery was required. (Tr. 204-205, 218).
 {¶ 18} Appellee then insisted that the incision he made did not go through a fracture blister as Dr. Walker implied. (Tr. 196, 199-200). He claimed that the ultimate failure of fixation does not mean that it was originally a negligent reduction and fixation. (Tr. 211-212). Appellee concluded that the films showed excellent alignment and reduction for the injury. (Tr. 239). He explained that continuity of care with the original surgeon is important. He also declared that Dr. Walker's October 20, 2000 decision to change the recommendation to weight bearing was not in appellant's best interests as there was not yet evidence of healing. (Tr. 264). Notably, Dr. Walker's testimony admitted that weight bearing is only appropriate at eight to twelve weeks after surgery if there are signs of healing and the patient is pain-free. (Tr. 393). *Page 6 
 {¶ 19} An infectious disease expert testified for the defense. He opined that the deep infection did not occur until late October 2000 and that operative care was not the cause of said bone infection. (Tr. 584). He also explained that five to ten percent of patients with this type of fracture generally experience a bone infection. (Tr. 587-588).
 {¶ 20} Appellee's main expert was Dr. Lee, an orthopedic surgeon from Ohio State University with a foot and ankle sub-specialty, which includes all parts of the leg from the knee down. (Tr. 630-631). He encounters approximately five tibia-fibula fractures per month in his practice, and five percent of those will experience major complications. (Tr. 634, 653). Dr. Lee testified that it was proper to try to perform surgery ahead of swelling, that appellee did not make an incision through a fracture blister and that ORIF was the only realistic option. (Tr. 645, 647, 650, 654-656, 672, 684). He concluded that the swelling could not have been prohibitive of surgery or appellee would not have been able to close the wound. (Tr. 657). He also confirmed that it would have been risky to open the splint for examination prior to arriving in surgery. (Tr. 649).
 {¶ 21} Dr. Lee then stated that any angulation issue was not a reflection of an improper standard of care but just reflects that appellee could not get the bone straight, noting that certain angular parameters are acceptable. (Tr. 661). He acknowledged that rigid fixation was attempted but was not achieved. (Tr. 673). Dr. Lee also believed that reduction and fixation were adequate and that the failure to obtain rigid fixation was not a reflection of a lack of the standard of care. (Tr. 657, 674). He noted that 100% boney contact is ideal but not required for healing. (Tr. 662, 664). Dr. Lee disclosed that the situation was not perfect but was acceptable and that he would have been satisfied at the end of the surgery, which required closing after the length of time and the tourniquet use. (Tr. 667-668, 670, 674). He pointed out that perfection is the original goal but is rarely possible. (Tr. 669).
 {¶ 22} Dr. Lee advised that the bones would have stayed in place if appellant would have stayed off his leg, and he attributed the ultimate failure of fixation to something other than appellee's acts. (Tr. 659-660). He noted that a failure to heal will always cause fixation to fail and a lack of healing can be caused by movement, a failure to elevate and the biology of the patient. (Tr. 698-699). As to the cast, Dr. Lee opined that it was acceptable to cast after surgery, that splitting the cast due to *Page 7 
swelling was not indicative of anything negligent and that one could argue that it may have been dangerous not to cast. (Tr. 675-677).
 {¶ 23} On March 6, 2006, the jury returned a unanimous verdict in favor of appellee. By way of special interrogatory, the jury determined that appellee was not negligent. On March 20, 2006, appellant filed a motion for a new trial alleging that the verdict was contrary to the manifest weight of the evidence. On April 14, 2006, the trial court overruled the motion, pointing out that it is not the court's function to substitute its judgment for that of the jury and stating that the jury's verdict was supported by testimony of an orthopedic surgeon with impressive credentials. Appellant filed timely notice of appeal.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 24} Appellant's first assignment of error contends:
 {¶ 25} "THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN THIS MEDICAL MALPRACTICE ACTION, WHERE:
 {¶ 26} "A. PLAINTIFF PRESENTED AN EXPERT WHO ESTABLISHED THE APPROPRIATE NATIONAL STANDARD OF CARE FOR ORTHOPEDIC SPECIALISTS IN THE YEAR 2000."
 {¶ 27} "B. PLAINTIFF'S EXPERT PRESENTED, EXPLAINED AND SUPPORTED HIS OPINIONS THAT THE DEFENDANT BREACHED THE STANDARD OF CARE, AND THAT THE PLAINTIFF'S INJURIES AND PERMANENT DISABILITY PROXIMATELY RESULTED FROM THE DEFENDANT'S BREACH OF THE STANDARD OF CARE, AND
 {¶ 28} "C. DEFENDANT PRESENTED ONE EXPERT WHO BASED HIS OPINIONS ON A FICTITIOUS, UNRECOGNIZED, AND IRRELEVANT REGIONAL STANDARD OF CARE FOR `AVERAGE AND PRUDENT ORDINARY SURGEON[S].'"
 {¶ 29} First, we must address appellant's contentions that: the expert rendered an unreliable definition of standard of care; his testimony was thus unreliable as a matter of law; and, the jury must have ignored the court's instruction on standard of care in order to utilize this expert's testimony that appellee was not negligent. The court instructed the jury as follows:
 {¶ 30} "In medicine, a specialist is a physician who holds himself out as specially trained, skilled and qualified in a particular branch of medicine. The standard of care for a physician in the practice of a specialty is that of a reasonable specialist *Page 8 
practicing in that same specialty regardless of where he practices. A specialist in any one branch has the same standard of care as in all other branches — as all other specialists in the branch does. If you find by the greater weight of the evidence that the defendant failed to use that standard of care, then you may find that he was negligent.
 {¶ 31} "Although some other orthopedic specialist might have used a method of treatment or procedure different from that used by Dr. Kasamias, this circumstance will not, by itself, without more, prove that Dr. Kasamias was negligent. You must decide ladies and gentlemen, whether the treatment and procedure used by Dr. Kasamias was reasonably careful and in accordance with the standard of care required of a specialist in his field of practice.
 {¶ 32} "A physician does not guarantee that his care and treatment of a patient will always be successful, nor does a physician promise that nothing serious will arise as a result thereof. Rather, his duty is to exercise that degree of care, skill and diligence which is ordinarily exercised in the medical profession in the same medical specialty. There is not presumption or inference arising from the fact that a bad or unexpected result occurs.
 {¶ 33} "Now, in this case Dr. Kasamias specializes is orthopedics. Accordingly, he did have a duty to exercise that degree of care, skill and diligence ordinarily employed by other members of the medical profession who also specialize in orthopedics." (Tr. 857-859).
 {¶ 34} Appellant agrees that the court's instruction was a proper statement of the law on the standard of care for a specialist. He claims, however, that the jury must have disregarded the instruction when they relied on an expert who allegedly defined the standard of care wrong. Appellant adds that the expert's testimony violated various Evidence Rules regarding reliable and relevant testimony. This argument is entirely based upon the following excerpt:
 {¶ 35} "Q. Dr. Lee are you familiar with the standard of care applicable to orthopedic surgeons in the treatment of tibia fibula fractures in the year 2000?
 {¶ 36} "A. Yes, I am.
 {¶ 37} "Q. And what do you — can you define for us the standard of care or what do we mean by standard of care? *Page 9 
 {¶ 38} "A. I think the standard of care is what an average and prudent ordinary surgeon in the State of Ohio would do or would not do in a given condition." (Tr. 634).
 {¶ 39} Appellant believes that this expert's entire testimony is tainted by his definition because it failed to specify "orthopedic" surgeon, because "average and prudent ordinary" is not the same as "reasonable" and because it limited its geography to the State of Ohio. First, "reasonable surgeon" is not so different from "average and prudent ordinary surgeon." As a matter of fact, the trial court, whose definitions are relied upon by appellant, used ordinary and reasonable interchangeably when setting forth the legal definition of standard of care. Reasonable care is regularly defined as that degree of care which a person of ordinary prudence would exercise. See Black's Law Dictionary (6th Ed.) 1265. And, reasonable diligence is equated with an ordinary prudent person as well. See, e.g., Sizemore v. Smith (1983),6 Ohio St.3d 330, 332. Thus, the expert's use of "average and prudent ordinary" in place of "reasonable" did not taint his testimony.
 {¶ 40} Second, Dr. Lee's answer must be read in context of the questioning. In doing so, one could find that Dr. Lee was speaking of orthopedic surgeons, as opposed to surgeons in general. He was an orthopedic surgeon testifying as to his specialty, and the original question referred to such specialist.
 {¶ 41} Third, although the standard of care is not limited by geography, Dr. Lee's mention of surgeons in this state does not corrupt Dr. Lee's testimony in this state court trial. That is, there was no indication that he was saying the standard is lesser here in Ohio than in the rest of the country. See Bruni v. Tatsumi (1976),46 Ohio St.2d 127, 134-135 (holding that geographical conditions or circumstances do not control either the standard of the specialist's care or the competence of the expert's testimony). In fact, both side's experts were from the same state as each other and the same state as the defendant. Cf. id. Additionally, appellant's own expert misstated that standard of care depends on geography. (Tr. 274). Thus, if Dr. Lee's testimony is invalid for this reason, then so would Dr. Walker's testimony be invalid, and it is Dr. Walker's testimony that appellant's whole case relies upon.
 {¶ 42} Regardless, the expert's job is to state the applicable factual medical standard of care in this case (and opine whether it was breached and whether such breach proximately caused the injuries). SeeBruni, 46 Ohio St.2d at 131-132 (the specialist standard prevailing in the medical community). That is, the expert states *Page 10 
what a reasonable specialist would have or would not have done to this patient and whether this defendant performed as a reasonable specialist would have performed. See id. Dr. Lee performed this function by explaining why the actions taken by appellee were proper, regardless of any legal definition of standard of care in general.
 {¶ 43} It is not the expert's responsibility to accurately providelegal definitions to the jury. Providing legal definitions, including the definition of the standard of care for a legal medical malpractice case, is the province of the court. The trial court noted the distinction in the legal definition of standard of care when Dr. Walker gave his own attempt at defining the general standard. (Tr. 275). The court subsequently provided the proper legal standard in its jury charge, which preempts any legal definitions attempted by the witnesses. (Tr. 857-859).
 {¶ 44} It is also notable that both Dr. Lee and Dr. Walker were asked to define standard of care in general. Appellee objected to this line of questioning of Dr. Walker, but appellant did not follow suit and object to Dr. Lee's definition or testimony. For all of these reasons, appellant's initial argument is without merit.
 {¶ 45} Next, appellant argues that Dr. Lee's testimony violated Evid.R. 705 because it was not supported by underlying facts or available data due to the fact that Dr. Lee discounted nurses' notes and a radiologist report regarding the swelling. Once again, appellant failed to object to the alleged violation of this evidentiary rule. Thus, any error is waived. See Evid.R. 103(A)(1).
 {¶ 46} Regardless, accepting the existence of certain evidence does not automatically require accepting its value. In other words, just because nurses and a radiologist found a certain amount of swelling does not per se mean that any opinion finding that surgery was permissible is invalid. Moreover, appellee explained that the radiologist could have mistaken deformity for considerable swelling and how the nurses could not have actually judged the swelling of the leg because the splint was blocking any view. Other testimony established that nurses are not permitted to remove or unwrap the splint. Dr. Lee's statements, that swelling always and inevitably occurs with these types of fractures and that a surgeon's choice to operate in the face of swelling can be approved later by the mere fact that he achieved closure of the wound, are permissible expert opinions. Appellee also testified that when he did unwrap the splint before surgery, he concluded that the swelling was not prohibitive of surgery. Dr. Lee and even Dr. Walker approved this procedure of waiting to check the *Page 11 
swelling until in the operating room. Although appellant disagrees with appellee's decision to operate due to non-specialists' descriptions of the swelling, this decision is one of the main issues of the case for the jury; it is a factual issue rather than a legal matter.
 {¶ 47} Finally, appellant basically contends that Dr. Walker's testimony on the applicable standard of care was more credible than that of Dr. Lee. Appellant complains that Dr. Lee testified that a failure to achieve rigid fixation does not necessarily mean that the standard of care was violated. He focuses on Dr. Lee's opinion that it appeared appellee tried to achieve rigid fixation but denigrates Dr. Lee's opinion that the ultimate lack of rigid fixation was not due to negligence and is not absolutely required in this specialty.
 {¶ 48} In evaluating whether a civil judgment is against the manifest weight of the evidence, the reviewing court's function is merely to determine whether there is some competent, credible evidence going to all the essential elements of the case. CE. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, 280 (reversing court of appeals and affirming judgment of trial court). The appellate court cannot go beyond this role by rejecting the fact-finder's characterization of witness testimony and inserting its own characterization of such testimony.Complete Gen. Constr. Co. v. Ohio Dept. of Transp. (2002),94 Ohio St.3d 54, 61 (overturning an appellate court's reversal of a trial court judgment). Questions of fact are best left to the trier of fact as there is a presumption that factual findings are correct. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 79-80. This is partly because the fact-finder sits in the best position from which to view the demeanor, voice inflection and gestures of the witnesses. Id. at 80.
 {¶ 49} Here, the jury could reasonably choose to believe that Dr. Lee's assessment of the situation was credible and worthy of great weight. Appellee and Dr. Lee both urged that the timing, technique and post-operative care were proper, regular and acceptable. For instance, appellee stated that he personally evaluated the swelling before surgery while under general anesthesia and he still felt that surgery should proceed. On the other hand, Dr. Walker did not see the swelling; rather, he utilized notes of non-specialists which briefly described the swelling. The notes of the nurses could be considered to lack credibility as it was shown to be highly unlikely that they actually could see the swelling on the lower leg. (Tr. 173-178). The radiologist's *Page 12 
report of "considerable swelling" could be explained by the deformity and is a subjective statement that does not necessarily mean that surgery should not be performed. (Tr. 169). At one point, even Dr. Walker discounted a radiologist's opinion regarding orthopedic decisions. (Tr. 388).
 {¶ 50} In fact, in spite of Dr. Walker's testimony that the timing of this surgery was too early and that appellant should have been ordered to wait around for a few weeks with broken bones, Dr. Walker then stated that partial surgery from the outside of the leg could have been proper reserving the surgery from the inside of the leg until later. (Tr. 283). This implied that his timing argument dealt with fracture blisters in combination with swelling. Specifically, Dr. Walker testified that it is improper to make an incision through a blister, and this standard was not contradicted. However, appellee testified that his incision was not near the fracture blister. (Tr. 196, 199-200). Dr. Lee also noted that the incision was not through the blister as he viewed photographs. (Tr. 684).
 {¶ 51} As for the results of the ORIF surgery, Dr. Walker admitted that the choice of hardware was not negligent. (Tr. 346). Appellee explained how the spiral fracture of the tibia and the butterfly fragment of the fibula made for a more difficult reduction and fixation of this widely displaced fracture. (Tr. 218, 227-238). Appellee explained that every fixation can go on to fail. (Tr. 211). Appellee believed that his alignment and reduction were excellent. (Tr. 239). Dr. Lee testified that rigid fixation is not always possible given the circumstances in each situation. Dr. Lee opined that there was very good fixation, that he would have been satisfied with the surgery and that he would have closed at the time appellee did. (Tr. 667-668, 674).
 {¶ 52} The jury could determine that Dr. Walker's opinion was too harsh as it could be characterized as requiring perfection in the performance of an ORIF surgery, whereas Dr. Lee stated that perfection is rarely possible for a reasonable surgeon (or even for an accomplished sub-specialist) and that major complications do occur in the absence of negligence. (Tr. 653, 669, 674). Considering all the evidence set forth supra in the statement of facts, such contentions are supported by some competent, credible evidence.
 {¶ 53} There were many reasonable conclusions that could be drawn from the evidence presented. The jury could have determined that an infection caused bone disintegration and thus the failure of fixation. The jury could have concluded that other *Page 13 
physicians employed after leaving appellee's care overlooked the signs of a deep infection at a time when catching it would have avoided further bone damage.
 {¶ 54} The jury could have believed that one or both of appellant's infections resulted from his contact with his tigers, lions, bear or deer or items that those animals had touched. Notes from Dr. Walker and the Cleveland Clinic's infectious disease staff express this probability regarding the second infection. (Tr. 120-121, 410). In fact, appellant testified that the tigers will eat marshmallows out of his hand, showing more than distant caretaking. Additionally, appellant's wife testified that she transported appellant shortly after his surgery with an injured baby deer in the car, and immediately after his appointment with appellee, appellant went to the veterinarian's office due to this deer's broken leg. (Tr. 120-121, 458).
 {¶ 55} Furthermore, the jury could have found that appellant failed to diligently follow appellee's instructions regarding elevation and non-weight bearing. They could have decided that appellant's fall in his yard when he tore his left meniscus actually did jar the bones and hardware in his fragile right leg. Moreover, the jury could have determined that Dr. Walker prematurely recommended weight bearing and that this caused the injury and failure of fixation. Subsequently, the jury could have believed that the only cause of his latest tibia fracture was improper method or timing of physical therapy. Finally, the jury could have accepted the testimony that casting after the surgery was necessary or at least reasonable. (Tr. 676, 671).
 {¶ 56} We cannot substitute our judgment for that of the jury on such factual matters. The jury's verdict is not contrary to the manifest weight of the evidence. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 57} Appellant's second assignment of error alleges:
 {¶ 58} "THE TRIAL COURT ERRED IN (i) GRANTING JUDGMENT OF THE JURY'S VERDICT AND (ii) NOT GRANTING PLAINTIFF'S MOTION FOR NEW TRIAL SIMPLY BECAUSE THE DEFENDANT'S EXPERT `[IS] AN ORTHOPEDIC SPECIALIST WITH IMPRESSIVE CREDENTIALS."
 {¶ 59} Appellant filed a motion for new trial on the grounds that the verdict was against the manifest weight of the evidence. The trial court denied this motion explaining that it was not the function of the court to substitute its judgment for that of the jury and noting that the verdict was supported by the testimony of Dr. Lee, who the *Page 14 
court described as an orthopedic specialist with impressive credentials. Appellant uses the same contentions raised above to argue that the trial court should have granted a new trial because the verdict was against the weight of the evidence.
 {¶ 60} Pursuant to Civ.R. 59(A)(6), a new trial may be granted on the grounds that the verdict is not supported by the weight of the evidence. When ruling on a motion for a new trial, the trial court is afforded wide discretion in determining whether a jury's verdict is against the manifest weight of the evidence. Osler v. City of Lorain (1986),28 Ohio St.3d 345, 351. See, also, Jenkins v. Krieger (1981), 67 Ohio St.2d 314,320; Rohde v. Farmer (1970), 23 Ohio St.2d 82, 91-93.
 {¶ 61} Based upon our rationale set forth under the first assignment of error, we cannot say that the trial court abused its discretion in denying the motion for a new trial based upon the weight of the evidence. This assignment of error is therefore overruled as well.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 62} Appellant's third and final assignment of error provides:
 {¶ 63} "THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION TO REDUCE DISCOVERY DEPOSITION FEES DEMANDED BY THE DEFENDANT'S EXPERT WITNESS."
 {¶ 64} When appellant sought to depose appellee's expert, Dr. Lee requested $650 per hour in deposition fees for a minimum of two hours for a deposition to be held in Dr. Lee's Columbus office. In November 2003, appellant paid the $1,300 to Dr. Lee. However, appellant then cancelled the scheduled deposition. Upon rescheduling, Dr. Lee sought another $1,300 due to appellant's late cancellation, which forfeited the first payment under the fee schedule and terms received by appellant's counsel.
 {¶ 65} On April 6, 2004, appellant filed a motion to reduce Dr. Lee's deposition fee to $200 or $250 per hour billed in quarter-hour increments. In the alternative, appellant asked the court to order appellee to pay Dr. Lee's fee and to refund all or part of the $1,300 appellant already paid as it was excessive. Appellant also asked the court to order appellee to produce Dr. Lee in Mahoning County at appellee's or Dr. Lee's own expense.
 {¶ 66} Appellant attached an affidavit, letters regarding the fees and a brief to his motion. The brief urged that the defendant should not be able to agree to an *Page 15 
unreasonable fee schedule with his expert that binds the plaintiff. Appellant urged that if a plaintiffs right to discover the opposing expert's opinion depends on whether the plaintiff can afford to pay an arbitrarily set fee, then defense firms will seek the most expensive expert they can find in order to make discovery cost-prohibitive. Appellant cited Civ.R. 26(B)(4)(c) and concluded that Dr. Lee's fee demand was an unreasonable obstacle to discovery.
 {¶ 67} On May 13, 2004, appellee responded to appellant's motion by outlining the relevant discovery occurrences. Appellee noted that appellant was not available for deposition dates in early November 2003. Thus, appellant was going to seek a continuance of the November 21, 2003 trial. As a result, on November 4, 2003, appellee scheduled Dr. Lee's deposition for November 21. The time was confirmed on November 10, 2003, and on that date, appellant tendered the $1,300 check in anticipation of the deposition. Then, on November 19, 2003, appellant's counsel advised that he could not get a criminal hearing postponed and thus would have to reschedule the November 21 deposition. Appellee pointed to the fee schedule received by appellant stating that Dr. Lee's deposition fee was nonrefundable for cancellations with less than seven days notice.
 {¶ 68} Appellee's response then pointed to the fact that appellant did not object to the reasonableness of the fee at the time the deposition was originally scheduled and paid. Appellee agreed that if a defense expert's fees are excessive, then the defendant must pay the difference or decide not to use that expert. However, appellee urged that $650 per hour is not an unreasonable charge for an orthopedic surgeon in active clinical practice. Appellee argued that the $200 per hour rate proposed by appellant was grossly inadequate. On May 19, 2004, the trial court denied appellant's motion.
 {¶ 69} On August 19, 2004, appellant served a subpoena on Dr. Lee ordering him to appear at appellant's counsel's office on September 13, 2004 for deposition and to produce documents. On September 7, 2004, appellee filed a motion to quash the part of the subpoena that ordered Dr. Lee to appear for deposition. Appellee claimed that appellant was attempting to circumvent the court's May 19, 2004 denial of appellant's motion to reduce or eliminate further deposition fees.
 {¶ 70} The parties then attended a pretrial. On September 9, 2004, the court entered an order revealing that appellant agreed to withdraw the subpoena, appellee *Page 16 
agreed to withdraw his motion to quash, and the parties agreed to share equally in the expenses charged by Dr. Lee for his discovery deposition. Appellee was ordered to pay all expenses associated with preparing Dr. Lee for his discovery deposition. However, the court specifically stated that the agreement was without prejudice as to the appealability of the reasonableness of the fees charged.
 {¶ 71} Appellant now appeals the trial court's May 19, 2004 decision denying appellant's motion to reduce Dr. Lee's fees. On appeal, appellant raises the same arguments raised before the trial court. He asks us to decrease his liability for Dr. Lee's fee to $200 per hour in quarter-hour increments or to order appellee to pay the deposition fee and refund the $1,300 paid in November 2003. Appellant cites two cases in support of his request.
 {¶ 72} The first case is set forth by appellant as an example of a court excluding expert testimony due to excessive fees. Anderson v.Nunnari (Nov. 16, 2000), 8th Dist. No. 00-LW-5208. Contrary to the suggestions in appellant's case review, excessive deposition fees were not in fact the reason for the exclusion sanction in Anderson. Rather, the sanction of exclusion was imposed due to the discovery violation of Civ.R. 26(E), which requires supplementation of responses on the identity of testifying experts and the subject matter of the testimony. The expert's fee schedule was mentioned in the facts as the reason the deposition did not proceed; however, the trial and appellate courts' decisions were based upon the failure to seasonably supplement the interrogatory responses. Moreover, as appellee points out, plaintiff's attorney in Anderson agreed to pay $400 per hour in deposition fees in 1999.
 {¶ 73} In the second case appellant cites, the defense expert demanded $1,500 per hour for deposition. Samples v. Saint Thomas Med. Ctr (Apr. 14, 1998), Case No. CV-1998-04-1505. Plaintiff asked for a fee reduction, and the judge responded by ordering defendant to pay the expert's deposition fee. However, $1,500 per hour for an unspecified expert in 1998 is different than $650 per hour for an orthopedic surgeon in 2003-2004. Furthermore, the review we conduct is for an abuse of discretion; thus, a prior trial court's decision granting or denying relief from expert fees is not inherently persuasive authority to an appellate court in another case.
 {¶ 74} Civ.R. 26(B)(4)(c), provides in pertinent part: *Page 17 
 {¶ 75} "The court may require that the party seeking discovery under subdivision (B)(4)(b) of this rule pay the expert a reasonable fee for time spent in responding to discovery, and, with respect to discovery permitted under subdivision (B)(4)(a) of this rule, may require a party to pay another party a fair portion of the fees and expenses incurred by the latter party in obtaining facts and opinions from the expert."
 {¶ 76} Thus, a motion to reduce fees can be a valid request when an opponent's expert desires discovery deposition fees that are considered unreasonable. The standard for reviewing a trial court's decision in any discovery matter is abuse of discretion. Maschari v. Tone,103 Ohio St.3d 411, 2004-Ohio-5342, ¶ 18. A court's decision only constitutes an abuse of discretion if it was unreasonable, arbitrary, or unconscionable. Id. As such, we are asked to determine whether it was unreasonable for the trial court to determine that $650 per hour was a facially reasonable fee for a discovery deposition by an orthopedic surgeon in 2003-2004 in Columbus, Ohio.
 {¶ 77} We note another trial court case that we have found in researching the issue. In 1994, a Stark County trial court found a defense expert's fee of $500 per hour for an in-office discovery deposition and $750 per hour for an in-office video discovery deposition to be unreasonable and reduced the fee to $250 per hour on behalf of the plaintiff. Kirby v. Ahmed (1994), 63 Ohio Misc.2d 533. As in theSamples case cited by appellant, this is merely a trial court case where the court had discretion to deny or grant the motion for fee reduction. Also distinguishable is the fact that the hourly rates found to be excessive were charged in a case ten years prior to those in the present case. However, the court made a compelling pronouncement concerning the reasonableness of the discovery deposition fees:
 {¶ 78} "This court has no doubt that Artz is indeed a well-qualified physician and that he has the qualifications and expertise to testify in this particular case. He certainly must be compensated for his efforts. What charges are made by Artz to his patients in his work environment is of no concern to this court. But when he participates in the justice system as a witness where our citizens seek justice, he must submit to the standards prescribed by Civ.R. 26, which requires that an expert witness is not free to arbitrarily dictate his compensation and burden his adversary with whatever price tag he decrees. The plaintiff having handpicked Artz, the defendant *Page 18 
who happens to be of the same profession as Artz, is at the complete mercy of Artz. The defendant, in other words, becomes a hostage who has no leverage whatever to bargain or negotiate a price mutually agreeable to himself and Artz. Such an event can and does have cataclysmic and unwanted results in the justice system and must be discouraged at all costs.
 {¶ 79} "In a recent federal case, the court analyzed the Federal Rule of Civil Procedure that parallels Ohio Civ.R. 26 by eloquently stating: `* * * the mandate of Rule 26(b)(4)(C) is not that an adverse expert will be paid his heart's desire, but that he will be paid `a reasonable fee.' The ultimate goal must be to calibrate the balance so that a plaintiff will not be unduly hampered in his/her efforts to attract competent experts, while at the same time, an inquiring defendant will not be unfairly burdened by excessive ransoms which produce windfalls for the plaintiff's experts.' Anthony v. Abbott Laboratories
(D.C.R.I.1985), 106 F.R.D. 461; Hensley v. Eckerhart, 461 U.S. 424, 430,103 S.Ct. 1933, 1938, 76 L.Ed.2d 40, 48 (1983)." Id. at 535.
 {¶ 80} The rationale expressed by the Kirby Court is an enlightening analysis of Civ.R. 26 and its reasonableness requirement. As a reviewing court, we must balance these acknowledged concerns with the discretion afforded to the trial court's decisions on such matters upon consideration of the evidence presented to that court. We are greatly concerned with accessibility to court proceedings and the maintenance of a reasonable allocation of expert fees under Civ.R. 26. However, we have two barriers to ruling in appellant's favor.
 {¶ 81} First, appellant failed to attempt to establish through relevant evidence that $650 per hour was unreasonable by presenting affidavits of orthopedic surgeons in the region who act as experts or by requesting a hearing at which to present such testimony or evidence. Appellant's motion merely cited to San Diego Superior Court Rule 2.1.11. This rule declares that the ordinary and customary fee that shall be paid to physicians, osteopaths, surgeons, dentists, psychiatrists and attorneys testifying as expert witnesses in San Diego courts is $250 per hour. The rule also notes that excessive expert witness fees limit the access to the court and undermine the quality of justice.
 {¶ 82} However, this does not substitute for the presentation of relevant factual evidence on the unreasonableness of this expert's fee. Ohio courts are not bound by a San Diego rule that sets across the board fees for all experts of a certain type. *Page 19 
Rather, under Civ.R. 26, our courts have discretion to determine a reasonable fee as the issue arises in each case. Here, neither this court nor the trial court have been enlightened on what the average orthopedic surgeon (one with a sub-specialty) charges to give expert testimony or what would be a reasonable fee in Ohio.
 {¶ 83} Although the standard of care does not change by locality, there is no indication that the reasonableness of a fee does not vary by locality, and there is no requirement that the court accept what a San Diego court pronounced as ordinary and customary for a class of experts ranging from dentists to specializing surgeons. In fact, considering the diverse educational and licensing requirements and the varying malpractice risk levels, an Ohio court could find it unreasonable that a dentist's fee is the same as a specializing surgeon's fee as the San Diego rule orders. See Vance v. Marion Gen. Hosp., 165 Ohio App.3d 615,2006-Ohio-146, ¶ 15 (finding that specialization is relevant, noting that the trial court examined evidence on similar witness fees by other physicians in this specialty and upholding the court's discretion in fashioning a compromise between what each side offered).
 {¶ 84} Besides this lack of substantive evidence, there are certain procedural problems. For instance, the defense ended up agreeing to pay for half of the second deposition fee. For all we know, this agreement was induced by the trial court's decision to reconsider the fee reduction motion. In any event, appellant only paid $325 per hour for the actual discovery deposition for a total of $650 for two hours. Thus, appellant's motion was granted at least in part as appellant's liability for appellee's expert was reduced from $650 to $325 per hour.
 {¶ 85} Although the agreed entry stated that appellant did not waive his right to appeal the reasonableness of the expert's fees, this second and actual deposition is technically the only one for which reduction was timely sought. That is, appellant waited five months after paying the fee for the first scheduled deposition to file the motion to reduce fees. If appellant truly contested the reasonableness of the original fee, he should have filed the motion before tendering payment or at least within a reasonable time after such tender. Instead, the $650 per hour fee was paid without complaint. Notably, the motivation behind the subsequent motion to reduce fees was the fact that the expert wanted a second fee (or refused to refund his first fee) after appellant untimely cancelled the deposition for which the expert had already cleared his calendar for two hours. Yet, the effect of the untimely cancellation ofthe *Page 20 deposition and the propriety of the forfeited payments is not raised asan issue herein. Thus, regardless of the reasonableness of a $650 per hour fee, appellant only timely moved to reduce a fee which ultimately cost him just $325 per hour. Such fee is not unreasonable on its face when reviewing for abuse of discretion.
 {¶ 86} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
DeGenaro, P.J., concurs.
 Waite, J., concurs. *Page 1